**NEVON DECASTRO, Plaintiff**

**v.**

**CATHERINE STUART AND ALL PERSONS CLAIMING
AN INTEREST IN 173-C-76 ESTATE
ANNA'S RETREAT, Defendants.**

Civil No. 342/1996

Territorial Court of the Virgin Islands

Division of St. Thomas and St. John

December 29, 2000

ERIC S. HORSTMEYER, ESQ., Dudley, Topper & Feuerzeig, St. Thomas, U.S.V.I., *for Plaintiff.*

DESMOND L. MAYNARD, ESQ., Law Offices of Desmond L. Maynard, St. Thomas, U.S.V.I., *for Defendant*

MEYERS, *Judge*

## MEMORANDUM OPINION

(Filed: December 29, 2000)

THIS MATTER is before the Court on Plaintiff Nevon DeCastro's (DeCastro) action to quiet title by adverse possession or, in the alternative, for unjust enrichment against Defendant Catherine Stuart (Stuart) and all persons claiming an interest in 173-C-76 Estate Anna's Retreat, St. Thomas, Virgin Islands, (the Property). For the reasons hereinafter stated, the Court finds in favor of the Plaintiff.

## I. FACTUAL AND PROCEDURAL HISTORY

DeCastro asserts that he first entered upon and began to farm the Property in or about 1967. At that time, the Property was vacant and overgrown with wild shrubbery and weeds. In 1971, DeCastro cleared the Property, began planting fruit trees and assorted vegetables, and built a fence to keep out animals. In or about 1974, he constructed a residence on the Property consisting of a concrete foundation and four rooms with

plumbing, electricity, telephone and cable service. Also occurring in or about 1974 was the formation of an organization known as UJAMAA Organic Gardens, Inc. (UJAMAA) by DeCastro and other farmers in the Anna's Retreat area. Several of the UJAMAA members also staked claims to various parcels of land near the Property and began residing on and farming the land.

In 1973, Community Development Corporation (Community Development) purchased Estate Anna's Retreat subdivisions 173 A, B, and C.[1] Parcel No. 173-C-76 was eventually carved out from No. 173C. The subdivisions were undeveloped with a few small wooden shacks where neighborhood youths, including DeCastro, who were members of UJAMAA, met. These youths also planted fruit trees on the Property. When Community Development began to subdivide Parcel 173C in 1978, its owner, William Farrington (Farrington), told members of UJAMAA to remove their shacks and leave the Property. They refused.

In 1979, Community Development filed an action in the Territorial Court against all of the members of UJAMAA, including DeCastro, for restitution of 173C Estate Anna's Retreat and the surrounding parcels. On May 1, 1980, the Court entered summary judgment in favor of Community Development vesting title in the remainder of Parcel 173. Pursuant thereto, a Writ of Restitution was issued June 5 and served June 9, 1980, on the members of UJAMAA. Territorial Court Deputy Marshals accompanied Farrington to 173C Estate Anna's Retreat to remove all UJAMAA members. The members' shacks were carefully dismantled, and the boards from the shacks were stacked for the members' use at an alternate farm site in Estate Bordeaux. However, there is contradictory testimony as to whether DeCastro actually vacated the Property along with the other UJAMAA members. DeCastro insists that he did not leave, but continued to reside on and farm the Property.

Between 1980 and 1988, Community Development subdivided various parcels of land for home sites and built roads in subdivision C. During this period, DeCastro worked on the subdivision for Community Development. Farrington worked on the Property, although not on a daily basis. As a result, he could not definitively state whether or not DeCastro was residing in the structure on the Property. DeCastro testified that even

---

[1] Those subdivisions were large tracts of land from which individual house plots were carved out.

when the marshals removed all other UJAMAA members, he remained and never relinquished possession of the Property. He further testified that after Hurricane Hugo damaged his house on the Property in 1989, he incurred additional costs to reconstruct it.

In 1993, after Farrington observed that DeCastro was still on the Property, he threatened to sue if DeCastro did not purchase the Property for $ 20,000.00 or vacate the Property. DeCastro agreed to purchase the Property and, on February 16, 1993, he gave Farrington $ 5,000.00 as down payment. For reasons left unclear from the testimony, DeCastro never paid the balance of the sale price; thus, the sale was never consummated. Thereafter, DeCastro filed an action for debt against Farrington in the small claims division of this court for a refund of the $5,000.00 deposit. However, the parties failed to appear for the trial on several scheduled dates; therefore, the matter was never heard. Farrington still has not returned the money.

On October 20, 1993, pursuant to a Writ of Execution resulting from a Judgment entered against Farrington and two of his development companies, the Territorial Court Marshal conducted an auction to sell the Property. On said day, Stuart purchased the Property for $ 9,900.00. Subsequently, Stuart visited the Property, discovered DeCastro residing thereon, and informed him he would have to vacate the Property. DeCastro refused to leave but offered to buy the Property from Stuart. Stuart declined the offer. In April 1995, Stuart received the Marshal's Deed to the Property after paying all the outstanding property taxes. Stuart served DeCastro with letters on August 1, 1995 and April 30, 1996, demanding that he vacate the premises or an action for eviction would be filed against him. DeCastro never left the Property nor did Stuart file any legal action to evict him.

On May 23, 1996, DeCastro filed the instant action against Stuart claiming adverse possession of the Property. Stuart counter-claimed with an action for trespass. On February 14, 2000, Decastro moved the Court for summary judgment asserting that there are no genuine issues of material fact and that he is entitled to a judgment as a matter of law. On March 30, 2000, Stuart responded with her opposition thereto and her Motion for Summary Judgment. Because there were genuine issues of material fact, both motions were denied. No other party entered an appearance although served by publication. The matter proceeded to trial by the Court sitting without a jury on May 15, 2000.

## II. DISCUSSION

The primary issue before this Court is whether DeCastro has established ownership of said Property by adverse possession pursuant to V.I. Code Ann. tit. 28, § 11 which provides in pertinent part that:

> The uninterrupted, exclusive, actual, physical adverse, continuous, notorious possession of real property under claim or color of title for 15 years or more shall be conclusively presumed to give title thereto, except as against the Government.

In other words, "adverse possession is the ripening of hostile possession, under proper circumstances, into title by lapse of time." 3 AM. JUR. 2D *Adverse Possession* § 2 (1986). The requirements are designed to provide the record owner notice that someone else is claiming title to the property, *McNamara v. Christian*, 26 V.I. 109 (Terr. Ct. 1991). The lapse of time, provided it is 15 years or more, "... vests the possessor with title," and "protects those who have maintained the possession of property for the time specified by the statute under claim of right or color of title." 3 *Am. Jur. 2d* "Adverse Possession" § 3 (1986). An adverse claimant is required to prove all the elements of adverse possession by clear and convincing evidence, and the question of whether the claimant has met this burden is for the trier of fact to resolve. *McNamara* at 112; *Griles v. Griles,* 39 V.I. 135, 137 (Terr. Ct. 1998).

### A. Exclusive, Continuous and Uninterrupted Possession

DeCastro contends that he has held the Property exclusively, continuously, and uninterruptedly since 1967, although DeCastro was a minor at that time.[2] He manifested an intention to adversely possess the Property in 1974, at the age of 19, then an adult, by building a residence and fence and has never relinquished possession.

Stuart contends that a Writ of Restitution executed by the Marshals to remove all UJAMAA members from the Property interrupted DeCastro's possession during the statutory period in June 1980. Stuart further asserts that a judgment in ejectment tolls and arrests the statute of limitations when there is either surrender of the property, an entry by the owner, or

---

[2] DeCastro's date of birth is May 14, 1955. This Court makes no finding as to whether the possession of real property during one's minority should be credited towards the 15 years required by V.I. CODE ANN. tit. 28, § 11.

issuance of a *habere facias possessionem. See Rook v. Greenewald*, 22 Pa. Super. 641, 652 (Pa. Super 1903). In response. DeCastro states that in order for a legal proceeding to interrupt an adverse claimant's possession, the claimant must actually be ousted from the property.

Courts are split as to whether both judgment in favor of and recovery of possession by the true owner are necessary to toll the statute of limitations and interrupt the continuity of the adverse possession, or whether a mere judgment in favor of the true owner without actual change of possession is sufficient. 4 Tiffany, *The Law of Real Property*, § 1161 at 854. "Where the true owner obtains possession of the property as the result of an action at law or a suit in equity, the continuity of the adverse claimant's possession is necessarily broken and any right acquired by adverse occupancy is lost." 3 *Am. Jur. 2d*, "Adverse Possession" § 127 (1986). "Thus, a valid ... judgment ..., even before possession has been taken thereunder, will suspend the running of the statute, although the view has been taken that the judgment, to have such effect, must be made effectual by the execution of a writ of possession." *Id.* However, it is said that the effectiveness of the owner's entry is also lessened by judicial decisions insisting that the entry be accomplished in a peaceful manner and be unmistakably an ouster of the adverse possessor. 16 *Powell on Real Property* § 91.07[2] at 91-44 (1999). The true owner who brings an action to recover the land must successfully complete the action in order to terminate the adverse possession. *Id.* at 91-45.

In the case *sub judice*, the testimonial and documentary evidence did not conclusively demonstrate that an unmistakable ouster occurred or that the action to recover the land was successfully completed as against DeCastro. On or about June 9, 1980, Territorial Court Deputy Marshals went to 173C Estate Anna's Retreat, served a Writ of Restitution on the members of UJAMAA and coordinated their removal from the area. The boards from the members' shacks were stacked and transported to Estate Bordeaux for later use. However, the parcel occupied by DeCastro was left undisturbed. According to Yvonne Monsanto, one of DeCastro's neighbors, around 1980 the Marshals removed occupants living in the vicinity of the Property, but DeCastro remained and farmed the Property. Patrick Hanley, a friend of DeCastro, testified that between 1980 and 1989 he went to the Property almost every morning and helped DeCastro to farm the Property. Anthony West, a former member of UJAMAA, testified that he helped DeCastro weed and plant fruit trees until the

Marshals removed the members of UJAMAA, including himself. He further testified that the Marshals never removed DeCastro. Moreover, though there were discussions regarding the removal of the fruit trees on the Property, they were, likewise, never disturbed.

■ Farrington, on the other hand, testified that everyone was removed from 173C Estate Anna's Retreat including DeCastro thereby successfully interrupting the continuity of the adverse possession. However, he could not refute DeCastro's assertion that he resided on the Property during the execution of the Writ of Restitution and that he was never removed by the Marshals. Although Farrington worked on the Property following the execution of the Writ, he did not do so on a daily basis. Therefore, he could not definitively state whether DeCastro was present and residing in the four-room structure from some point in 1980 following the execution of the Writ of Execution until present. Moreover, in order to defeat the continuity of an adverse claimant's possession, the true owner's reentry should be a substantial and material interruption, and a notorious reentry rather than a casual reentry. *Otto v. Cornell*, 119 Wis. 2d 4, 349 N.W.2d 703 (Wis.App. 1984). In this case, there was never a change in possession.

■ The Court gives greater weight to the testimony of Yvonne Monsanto, Anthony West, Patrick Hanley and DeCastro himself than that of Farrington and finds that DeCastro never relinquished possession of the Property. The Court further finds that there was an unsuccessful attempt to remove DeCastro from the Property. Consequently, the Court concludes (1) that there was no interruption in the continuity of the adverse possession by the execution of the Writ of Restitution, (2) that there was never an ouster, (3) that Community Development never obtained possession of the Property, and (4) that the action to recover the Property was never successfully completed.

Assuming, arguendo, that DeCastro was removed and returned shortly thereafter, and remained in possession as a wrongdoer, such possession will have the same effect of a new disseisin. *3 Am. Jur. 2d* "Adverse Possession" § 126 (1986). Here, DeCastro retained possession of the Property in June 1980, after the Writ of Restitution was served. From June 1980 until Stuart served DeCastro with letters in May 1995 and April 1996, respectively, demanding he vacate the premises, DeCastro continued to retain exclusive, continuous and uninterrupted possession of the Property, thus fulfilling the 15-year statutory requirement.

121

## B. Hostile Possession

"Hostility of possession implies an assertion of ownership adverse to that of the true owner and all others." 3 AM. JUR. 2D *Adverse Possession* § 50 (1986). Possession of real property by an adverse claimant must be hostile to the whole world and without subserviency to, or recognition of, the title of the true owner. *Fleming v. Frett,* 33 V.I. 58, 61 (Terr. Ct. 1995) (*citing Cakebox Bakery, Inc. v. Maduro,* 15 V.I. 283 (Terr. Ct. 1978). There is no fixed rule or mechanical formula to determine hostile possession of real property by an adverse claimant. *Id.* A hostile claim of right is present when one does such acts on land "as ordinarily only an owner would do, such as construction of buildings and making of improvements, or the payment of taxes...." *Tutein v. Daniels,* 1973 U.S. Dist. LEXIS 5214, 10 V.I. 255 (Terr. Ct. 1973); *McNamara* at 113.

■ In the case at bar, DeCastro built a four-room structure, erected a fence and cultivated the land to produce over 200 fruit trees, vegetables, and tea bush all of which are acts ordinarily done by an owner. Furthermore, according to the testimony of Yvonne Monsanto, the fruit trees, house and fence could be seen from the road by neighbors, the public and the owner alike. These are strong indications that DeCastro was giving notice to the world of his ownership.

Stuart, however, argues that DeCastro's agreement to purchase the Property in 1993 from Farrington independently destroyed any claim for adverse possession by implicitly recognizing that his alleged title to the Property was subservient to that of Community Development. Her assertion is supported in part by *McNamara v. Christian, supra,* in which the Court stated that the adverse claimant's offer to purchase the property from the true owner five years after she had given the property to her son is inconsistent with any claim of right to the property. *Mc Namara* at 114-115.

■ Although in some cases an offer to purchase the legal title from the record owner constitutes acknowledgment of the record owner's superior title, "it is the general rule that one in adverse possession may seek to fortify his claim by attempting to purchase a pretended title without thereby necessarily interrupting his adverse possession" or "weakening the force or effect of the possession." 2 C.J.S. *Adverse Possession* § 186; *3 Am. Jur. 2d,* "Adverse Possession" § 119 (1986). "Thus, if the adverse possessor makes offers or overtures to another claimant in an effort to buy his peace, or quiet his title, as to avoid the harassment of litigation, he does not interrupt the

continuity of his adverse possession." 2 C.J.S. *Adverse Possession* § 186. Farrington, the owner of Community Development, testified that a third party arranged to sell the Property for him but could not complete the sale because DeCastro's structure was on the Property. Thereafter, in February 1993, DeCastro agreed to purchase the Property from Farrington and made a down payment of $ 5,000.00. For reasons left unclear from testimony, the sale was never finalized. DeCastro claimed that his attempt to purchase the Property was to prevent additional litigation. A review of the aforementioned circumstances indicates that Farrington's acceptance of the $5,000.00 down-payment accomplished exactly what DeCastro sought — avoidance of the harassment of litigation. Farrington took no further action. Accordingly, the Court finds that when DeCastro attempted to purchase the Property in order to buy his peace and avoid litigation, he did not interrupt the continuity of his adverse possession. This conclusion is further buttressed by the fact that the improvements made to the Property by DeCastro are sufficient acts on the land as those ordinarily done by an owner. Therefore, DeCastro's possession was hostile to the true owner and the world.

### C. Open and Notorious

■ "The words 'open and notorious possession,' as applied to the adverse holding of land by another, mean that the adverse claim of ownership must be evidenced by such conduct as is sufficient to put a man of ordinary prudence on notice of the fact that the land in question is held by the claimant as his own." *3 Am. Jur. 2d* "Adverse Possession" § 69 (1986). "Open and notorious possession contemplates possession that is unconcealed and so conspicuous that it is generally known by the public or by people in the neighborhood." 39 *Am. Jur.* "Proof of Facts 'Adverse Possession'" § 8 (1984); *McNamara* at 111; *Fleming* at 62. In *McNamara*, the adverse claimant had built a tool shed, kept his dog on the property, constructed a chain link fence and posted a no trespassing sign. However, the Court held that this was not adverse possession since no significant improvements or substantial permanent structures were erected. *26 V.I.* at 113. In contrast, the Court in *Fleming* held that Defendant Frett's use of the land, to wit: erecting a fence, building a home, cultivating the land and raising farm animals was adverse, open, and notorious, thus fulfilling the purpose of adverse possession. *33 V.I.* at 63 This Court adopts the holding in *Fleming*, as DeCastro made substantial improvements to the Property including clearing the land,

building a four-room structure with a concrete foundation, installing electricity and plumbing fixtures, erecting a fence around the Property, and cultivating the land. He also held himself out as the owner of the Property to his neighbors and sold the bounty of the land to the local community. Moreover, the testimony of Ms. Monsanto reinforces DeCastro's contention that he held out his possession, the Property, as that of the owner against the whole world. Therefore, the manner in which DeCastro possessed the land was sufficient to give the true owner notice that someone was claiming an interest in said Property.

## III. CONCLUSION

DeCastro has presented clear and convincing evidence of ownership. The record shows that DeCastro, during the 1970's, entered upon the Property and planted fruit trees, vegetables and tea bush, built a four-room structure and erected a fence. From 1974 until May 23, 1996, the date this case was filed, 22 years have passed which is clearly in excess of the 15 years required for adverse possession. Even if possession was interrupted in 1980 when the Marshals entered the Property, DeCastro continued to occupy the premises uninterruptedly until this case was filed in 1996, also in excess of the 15 years. Therefore, the Court concludes that DeCastro's possession of 173-C-76 Estate Anna's Retreat has been uninterrupted, exclusive, actual, physical, adverse, continuous, notorious, and hostile for the statutory period and title should vest in him. An appropriate Judgment will be entered.[3]

---

[3] How Stuart should recoup the monies she paid to purchase the Property and for real estate taxes is not before this Court.