Martin B. NETSKY and Tangara
E. Netsky, Plaintiffs,

v.

Violet SEWER and all other persons
claiming an interest in parcels 6E–1
and 6E–2 Estate Hansen Bay, St.
John, as shown on PWD Drawing D9–
1725–T81, Defendants.

CIVIL NO. 237/99.

District Court, Virgin Islands,
Div. St. Thomas and St. John.

May 16, 2002.

Maria Tankenson Hodge, Esq., Hodge & Francois, St. Thomas, V.I., Attorney for Plaintiffs Martin B. Netsky and Tangara E. Netsky.

Violet Sewer Mahabir, St. John, V.I., Lyle A. Battiste, St. Thomas, V.I., Lorne M. Battiste, Miami, FL, Irvin A Sewer, Wilma Marsh Monsanto, St. Thomas, V.I., Pro Se Defendant.

Karl Percell, Esq., Law Offices of Percell & Hermon–Percell, P.C., St. Thomas, V.I., Administrator for the Estate of James Wellington George.

## OPINION REGARDING MOTIONS FOR SUMMARY JUDGMENT

BROTMAN, District Judge, Sitting by Designation.

Presently before the Court are Motions for Summary Judgment filed by Martin B. Netsky and Tangara E. Netsky (hereinafter the "Netskys" or "Plaintiffs"), and one of Defendants, Irvin A. Sewer, ("Defendant"). On February 20, 2002, the Court held a hearing regarding these motions. For the reasons that follow, Defendant's Motion for Summary Judgment is DENIED and Plaintiffs' Motion for Summary Judgment is GRANTED.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Summary

This is a quiet title dispute over real property involving two parcels of land located at Parcel Nos. 6E–1 and 6E–2 (hereinafter collectively referred to as "Parcel 6E"), situated in Estate No. 6 Hansen Bay A, East End Quarter, St. John, Virgin Islands, between Plaintiffs and the following Defendants and Intervenors: the Estate of James Wellington George, et al.; Violet S. Mahabir (née Sewer) ("Violet Sewer"); Wilma Marsh Monsanto; Lyle A. Battiste; Lorne M. Battiste; and, Irvin A Sewer. (hereinafter collectively referred to as "Defendants").

In a three-count Complaint filed on December 30, 1999, Plaintiffs seek declaratory relief, the quieting of title, and injunctive relief against Defendants claiming an interest in Parcels 6E–1 and 6E–2, over which Plaintiffs claim that they are the lawful owners. Defendants claim that Plaintiffs' property, as described in the survey under which they took title in 1988 pursuant to a Consent Judgment, actually encroaches into Parcel 6AB, a parcel of land in which Defendants claim to have an

undivided interest and which is located directly adjacent to Parcel 6E.

## B. *Historical Background*

On or about August 30, 1988, Plaintiffs purchased Parcel 6E for $460,000.00 under a deed of the Clerk of the District Court of the Virgin Islands. The deed was issued pursuant to a Consent Judgment of the Court dated April 7, 1988 in a case captioned *Hoheb v. Muriel, et al.,* Civ. No.1983–85. (*See* Pls.' Br., Ex. A, B.).

In *Hoheb*, commenced in 1983, the original owners of Parcels 6E–1 and 6E–2 sought to rescind the sale of these parcels and other land in St. John from the Newfound Corporation and Gulf Carribbean Corporation. The plaintiffs in *Hoheb* were all the heirs of William and Martha George, both then deceased. Under the terms of the Consent Judgment, the *Hoheb* plaintiffs were required to sell Parcel 6E to provide funds for settlement. Parcel 6E was conveyed by deed to the Clerk of the District Court, as trustee for the parties, to the highest bidder for the property. The Netskys made the highest offer and paid $460,000. (*See* Pls.' Br. Ex. B). The description of the property conveyed under the Court's judgment was "Parcel 6E–1 and 6E–2, consisting of 1.76 acres, as per P.W.D. Drawing No. D9–T81." (*See id.;* Ex. A ¶ 13, Ex C.) The Clerk's deed conveyed title by reference to the same survey, as ordered by the Consent Judg-

ment. (Pls.' Br. Ex. B). Both the Consent Judgment and the deed from the Clerk of the Court were duly recorded on April 13, 1988, and October 12, 1988, respectively.[1]

Sometime in 1990, Plaintiffs hired a crew to begin clearing the land and dig post holes to build a fence around the property. (Pls.' Answers to Interrogs. at ¶ 2). They also hired the original surveyor, Charles Hamilton, to reconfirm his survey which formed the basis for the deed to the Netskys from the Court. (*Id.;* Aff. of Martin B. Netsky, Pls.' Br. Ex. G.; Dep. of Charles Hamilton at 91) ("Hamilton Dep."). Litigation commenced when Violet Sewer confronted Plaintiffs' workmen and asserted that they were working in an area in which she claimed an interest, an area identified by her as belonging to Parcel 6AB. (Dep. of Violet Sewer at 36–37) ("Violet Sewer Dep.").

Hamilton performed two surveys of Parcel 6E: one surveying Parcel 6E in its entirety, (*See* Survey of Parcel 6E and 6AB, A9–282–T80, Pls.' Br. Ex D) (the "Hamilton 1980 Survey"),[2] and a subdivision survey of Parcel 6E delineating the boundaries between Parcels 6E–1 and 6E–2 (*See* Survey of Parcels 6E–1 and 6E–2, PWD Drawing No. D9–1725–T81, Pls.' Br. Ex. C) (the "Hamilton 1981 Survey") (hereinafter collectively referred to as the "Hamilton Surveys"). Hamilton duly recorded these surveys in 1980 and 1981 at

---

**1.** Defendants attack the validity of the *Hoheb* Consent Judgment, claiming that because they were not parties to the case, they are not bound by that decision or the survey referenced in the deed from the Court Clerk. Defendants contend that the Court "set the boundaries" of Parcel 6E without involving adjoiners and interested parties. This is incorrect, however, for a review of the provided exhibits indicates that the Court adopted the only survey of public record for the subdivision of Parcel 6E, namely, P.W.D. Drawing No. D9–1725–T81. Moreover, Plaintiffs cite

the Consent Judgment merely to demonstrate the manner in which they took title to the property.

**2.** The Court notes that in Count One of Plaintiffs' Complaint, paragraphs 21(c), (e), (f), and (i), as well as in portions of memoranda, Map No. A9–282–T80 is improperly referenced as Map No. A9–282–T79. Upon further examination of the maps, the Court determines this to be a clerical error made by Plaintiffs because the actual year of recordation is 1980.

the Virgin Islands Cadastral Office. (*See* Hamilton Dep. at 90–91); *Netsky v. Sewer, et al.,* Civ. No. 99–237 (Hr'g Tr. of Feb. 20, 2002 at 5) ("Hr'g.Transcript"). The Hamilton surveys indicate that Parcel 6E directly abuts Parcel 6AB, lying immediately to the west. Hamilton testified that these were the first surveys conducted of Parcel 6E. (Hamilton Dep. at 91).

In addition to the Hamilton Surveys, two other surveys exist. These were performed by a deceased surveyor named Nathaniel Wells. The first is an unrecorded survey of Parcel 6AB dated December 6, 1957 (the "Unrecorded Wells Survey"), which was employed as an evidentiary exhibit in a 1950's quiet title action captioned *Alice V. Smith Sewer v. Ernestine Smith, et al.,* 3 V.I. 457 (1957), in the District Court of the Virgin Islands (hereinafter the "Alice Smith Sewer Lawsuit" discussed *infra*). (*See* Pls.' Br. Ex. E). The second is a publicly recorded survey of the parcel occupied by Alice Smith, designated 6ö–1 (the "Wells 6ö–1 Survey" or "Wells Recorded Survey"), which was performed in connection with that action but does not depict either Parcel 6E or 6AB. (*See* Pls.' Br. at Ex. F). The Wells 6ö–1 survey delineates the area actually occupied by Alice Smith that was awarded to her by the Court, and Hamilton cited and reflected them in his survey of Parcels 6E–1 and 6E–2. (*See id.* at Ex. C); (Hamilton Dep. at 8–9). Hamilton never saw the Unrecorded Wells Survey and did not reflect it in his own survey of Parcel 6AB performed in 1980. (Hamilton Dep. at 82).

Defendants allege that the Hamilton surveys wrongfully depict a portion of Parcel 6AB as belonging to Parcel 6E. They further contend that Hamilton is charged with the knowledge of the 1957 Unrecorded Wells Survey, that it represents the "original" survey of Parcel 6AB, and that he was therefore bound to follow in its

footsteps. Defendant Violet Sewer contends that her prepared survey, Map No. D9–6588–T99, filed on August 10, 1998 and recorded at the Virgin Islands Cadastral Office, accurately reflects the boundaries between Parcels 6AB and 6E because it recognizes and incorporates the 1957 Unrecorded Wells Survey as the "original survey."

Plaintiffs contend that because no other recorded survey existed in the Virgin Islands Cadastral Office depicting a survey of Parcels 6E and 6AB, the Hamilton Surveys recorded in 1980 and 1981 represent the original recorded surveys for both parcels. Plaintiffs relied upon the 1981 survey when they purchased Parcels 6E–1 and 6E–2 from the·Court in 1988 because there was no contrary survey on record. (Pls.' Br. Ex. G). As noted above, this dispute arose when Violet Sewer placed fence posts in the ground within the area designated Parcel 6E–2 on the Hamilton Survey and ·the Netsky deed, thereby leading Plaintiffs to commence this action on December 30, 1999.

## C. *The Defendants Involved in This Dispute*

Defendants can be categorized into two groups. The first group is comprised of Irvin Sewer and Violet Sewer, who are siblings, and Wilma Marsh Monsanto, their Aunt (for her mother,·Genevieve Marsh) who claim by descent from Emilie Roberts (hereinafter collectively referred to as the "Roberts Claimants"). Emilie Roberts, pursuant to the 1913 Agreement, discussed *infra*, possessed an undivided interest in Parcel 6AB. (*See* Dep. of Irvin Sewer at 6–7, 47) ("Irvin Sewer Dep."). The Roberts Claimants do not claim to be heirs of William and Martha George. (*See id.* at 7.).

The second group, hereinafter referred to as the "Battiste Claimants," consists of persons and parties claiming by descent

from James Wellington George, another person with an undivided interest in Parcel 6AB pursuant to the 1913 Agreement. The Battistes include: Leayle Battiste, who is the administrator of the Estates of Beulah Battiste, Anthon George, and James Wellington George (*See* James Wellington George's Mem. of Law in Opp'n to Pls.' Mot. for Summ. J.); and Lyle A. Battiste and Lorne M. Battiste, pro se, who have appeared in an individual capacity and contend that they are heirs to the estates of Beulah Battiste, Anthon George, and James Wellington George.[3] (*See* Defs. Lorne M. Battiste and Lyle A. Battiste's Mem. of Law in Supp. of Opp'n to Pls.' Mot. for Summ. J.). Having determined the relationship between the numerous defendants in this case, the Court turns to discuss the history underlying land ownership on the East End of St. John.

### D. The History of Land Ownership on the East End of St. John

To provide a historical lens through which the Court is to view the current matter before it, Plaintiffs direct the Court to the "1913 Agreement." The Court has significant knowledge and experience with this Agreement in that the Court recognized the 1913 Agreement as a valid basis of recording and conveyancing in the decision of *Newfound Management Corp. v. Sewer*, 885 F.Supp. 727, 760–62 (D.Vi. 1995), which helped to bring certainty to title and boundary disputes concerning the ruggedly beautiful Hansen Bay section of the East End of St. John. As evidenced by

the litigation presently before the Court, however, that task is not yet complete.

Parcels 6E and 6AB originate from the 1913 Agreement. Parcel 6E is shown as consisting of a two acre parcel of land belonging to the heirs of William and Martha George (Pls.' Br. Ex. T, H), and Parcel 6AB is also referenced as well. As to Parcel 6AB, the 1913 Agreement states in relevant part:

It is however understood that there are 3 Bays on the land here sold, namely one on the North side and two on the south side. At each Bay is reserved ab. 2 acres of land, which are not included in the sale but remains belonging to us say:

| | |
|---|---|
| J.W. Georges with | 2/6 part |
| Anna Maria George with | 1/6 part |
| Emilie Robert | 1/6 part |
| A.V. Lambertus | 1/6 part |
| And Wm. D. Georges heirs | 1/6 part |

And the northside Bays 2 acres are called Nr. 6aa and the two South side Bays 4 acres are called 6ab and 6ac. *See id.*

Accordingly, pursuant to the 1913 Agreement, the Heirs of William and Martha George possessed both Parcel 6E and an undivided one-sixth portion of Parcel 6AB. Plaintiffs contend that their recorded deed from the Court Clerk, acting as trustee for the Wilmar Corporation, and title holder to William and Martha George's interests in Parcel 6E, as well as the confirmed recorded history of title provided by the 1913 Agreement, demonstrates that they are direct successors in interest to the heirs of William and Martha George in Parcel 6E. Plaintiffs also maintain that the Hamilton Surveys depict both Parcels 6E

---

**3.** Plaintiffs claim that Lyle and Lorne Battiste, in their individual capacity, lack standing to assert claims or defenses because this power is solely within the capacity of Leayle Battiste, administrator of the estates of which there has been no final adjudication. Leayle Battiste is represented by Karl Percell, Esquire, as counsel. *See* 15 V.I.C. § 311 (stating that an "executor or administrator is entitled to the possession and control of the property of the deceased both real and personal and to receive the rents and profits thereof until the administration is completed ...").

and 6AB as less than the 2 acres that the 1913 Agreement stated to be the approximate size of each.

Defendants Irvin Sewer, Violet Sewer, Lyle and Lorne Battiste, and the Estate of James Wellington George have filed separate oppositions to Plaintiffs' Motion, raising a myriad of claims in response to Plaintiffs' contention that they have acquired "clean title" to Parcel 6E. Defendants assert that the 1957 Unrecorded Wells Survey performed in connection with the Alice Smith Lawsuit, discussed *infra,* is the "original" survey. They challenge, *inter alia,* the meaning and effect of the 1913 Agreement, the preclusive effect of the *Hoheb* Consent Judgment, and further claim that Plaintiffs had constructive notice of the disputed boundaries. Because Plaintiffs had constructive notice, they are barred by the equitable doctrine of laches from pursuing their claims.

Plaintiffs counter-argue that Defendants are the ones who are barred by laches because Plaintiffs are bona-fide purchasers who, unlike Defendants, did not possess long standing knowledge of the Hamilton Surveys. Plaintiffs contend that Defendants failed to formally contest Hamilton's delineation of boundaries between 6E and 6AB. Violet Sewer also makes a separate claim, contending that she holds valid title to a portion of Parcel 6E by virtue of her adverse possession. Plaintiffs dispute that she has made out a valid adverse possession claim.

Defendant Irvin Sewer, in his Motion for Summary Judgment, contends that an issue of fact remains as to Parcel 6E's official location because the 1913 Agreement does not specifically locate the property held by the Georges and their heirs. It is Sewer's position that because the heirs of William and Martha George did not possess an actual deed to Parcel 6E, they could not pass legal title to the Clerk of the Court. He therefore argues that a "break" or "vacuum" exists in the chain of Plaintiffs' title, which prevents them from having acquired proper legal title. (Def. Mot. for Summ. J. at 1–2). Plaintiffs concur that the 1913 Agreement is not a deed, per se, but contend that as an agreement between the parties, it clearly confirms the parties' ownership of portions of that land by the specific signatories to the agreement.

As a preliminary matter, the Court finds that Defendant's challenge to the validity of the 1913 Agreement is ineffective. The precedent of the Court recognizes that the 1913 Agreement was duly and properly recorded under the law in effect at the time of its execution, and the Court has recognized it as a valid basis for establishing title to property on the East End of St. John. *See Newfound,* 885 F.Supp. at 732–34. As the Court stated in *Newfound:*

> Two primary agreements memorialized the identification and transfer of East End Hansen Bay properties, specifically the 1894 and 1913 Agreements. These properly recorded agreements described land ownership interests and many early transfers of property between St. John property owners. These agreements set forth the initial transfers upon which later conveyances depended.

*Newfound,* 885 F.Supp. at 734.

Early agreements such as the 1913 Agreement have been recognized as acceptable methods to describe ownership and boundaries, dispensing with formal deed requirements as long as there was compliance with local recording statutes. *See, e.g., Smith v. Defreitas,* 329 F.2d 629 (3d Cir.1964) (establishing property rights under Danish law in force in St. Thomas, where prior to 1921, right to use the passageway vested in grantee of that parcel under recorded partition agreement of 1860); *Marsh v. United States,* No. 86–297

(D.V.I. filed Aug. 20, 1990) (assessing boundary line between two properties pursuant to 1904 Agreement entered into by owning parties).

The Court recognizes that the 1913 Agreement did not exactly detail land boundaries. In the interests of consistency, however, the Court will not construe it to mean that the 1913 Agreement or subsequent reliance thereon is to be disregarded. Accordingly, the next step for the Court is to look at the history of activity underlying Parcels 6E, 6AB, and the immediate surrounding area.

### E. *The Alice Smith Sewer Lawsuit and its Impact*

On May 14, 1957, pursuant to 28 V.I.C. § 11, Alice V. Smith Sewer filed an adverse possession and quiet title action in the District Court of the Virgin Islands seeking title to a parcel of land known as Parcel 6ö–1.[4] She identified herself as one of the legitimate heirs of Emilia (Amelia) George Smith and Emanuel Smith, both deceased. She further alleged and the Court found that her mother Emilia was one of the eight heirs of William and Martha George. (*See* Pls.' Br. Ex. J, at ¶ 2,

Ex. M at ¶ 2). Her verified complaint stated that William D. and Martha George were the owners of Parcel 6E, Estate Hansen Bay–A, "comprising two (2) acres, and a one-sixth (1/6) undivided interest in the undivided portion of said estate." (*Id.* at ¶ 3). The complaint referenced the 1913 Agreement, its recording information, and specified the allocation of approximately 30 acres of land as the Georges' separate property, designated 6ö. (*Id.* at ¶¶ 4, 5).

The court found that during the lifetime of Emilia Smith, Alice's mother, Emilia conveyed to her upon her marriage Emilia's share in Parcel 6ö to build a house thereon. (Pls.' Ex. M. at ¶¶ 4–7). Alice, in reliance upon the deed from her mother, fenced an area of land of approximately 0.52 acres. (*Id.* at ¶ 9). She built a house and resided on the property in exclusive physical possession from 1923 to at least 1951. (*Id.* at ¶ 13).[5]

After deliberation and consideration of all of the evidence in that case, the court held that pursuant to 28 V.I.C. § 11, Alice Smith Sewer acquired legal title to the portion of fenced-in land by adversely possessing it from the common Parcel 6AB.

---

4. Pursuant to Fed.R.Evid. 201(d), "a court shall take judicial notice of a fact if requested by a party and supplied with the necessary information. The Court therefore takes judicial notice of the existence of all pleadings, trial exhibits, opinions, and orders that accompany Plaintiffs' Motion for Summary Judgment and which relate directly to the Alice Smith Sewer Lawsuit." *See also Zahn v. Transamerica Corp.*, 162 F.2d 36 (3d Cir.1947)(taking judicial notice of pleadings in state case, since they were public documents); *Peter Bay Owners Ass'n Inc. v. Stillman*, 57 F.Supp.2d 192, 194–95 (D.Vi.1999)(taking judicial notice of fact that map was filed with the Court).

5. Plaintiffs also offer testimony from Guy Benjamin, a disinterested party, to support their contention that Alice Smith Sewer, a member of the William and Martha George

family and Plaintiffs' predecessor in interest, clearly resided on land that Plaintiffs now claim to own. Benjamin has personal knowledge of Alice Smith Sewer's occupancy and testified that Emelia Smith's house, and those of her daughter, Alice, and son Alan, were all located on Parcel 6AB, and that Alice's home was the closest one to the beach. (*See* Dep. of Guy Benjamin at 15–16, 30). He further testified that this area was entirely occupied by the heirs of William and Martha George. (*Id.* at 30–32). Defendants do not contradict Benjamin's testimony, acknowledging that Alan Smith resided in the Parcel designated 6E in Hamilton's survey, that he was a member of William and Martha George family, and that grave sites of their family are located within the boundaries of 6E. (*See* Irvin Sewer Dep. at 15–16, 30–32).

(*Id.* at ¶ 5) The Court's decree, dated September 24, 1958 states:

it is hereby:

ORDERED, ADJUDGED and DE-CREED that so much of parcel 6ö–1 and parcel 6Ab of Estate Hansen Bay–A, 6 East End Qtr., St. John, V.I., together comprising 0.52 acres, more or less, as surveyed and described in Plaintiff's Exhibit No. 9 (namely Survey of Nathaniel O. Wells, dated December 6, 1957—Plaintiff's Exhibit No. 9A—and Survey of Nathaniel O. Wells dated April 25, 1958 Plaintiff's Exhibit 9B), which parcel was fenced in by plaintiff since 1922 and held adversely in excess of the statutory period of 15 years under claim and color of title, be and the same is hereby decreed and confirmed as the property of plaintiff, in fee simple absolute, to her and her heirs and assigns forever.

(*See* Pls.' Br. Ex. I)

The Court did not render any findings or conclusions regarding the boundaries between 6E and 6AB, but the total size of Parcel 6AB was diminished by the court's judgment recognizing the existence of Parcel 6ö–1, as the decree explicitly states that a portion of Parcel 6AB was taken by the adversely possessed parcel. (*See id.*).

The Unrecorded Wells Survey, labeled Exhibit 9 in the Alice Smith Sewer suit, does not reflect the existence of Parcel 6E. (*See* Pls.' Br. Ex. E). Defendants now assert, however, that Wells' designation of an area to the west of what he designated Parcel 6AB in his unrecorded survey, and which he marked "6ö," was intended to be the Parcel that Hamilton designated as 6E. Plaintiffs counter that such an assertion would limit Parcel 6E's acreage to only 0.80 acres, deviating significantly from the 1913 Agreement, which states

that Parcel 6E was approximately 2 acres in size. (Pls.' Br. Ex. H).

### F. Defendants' Knowledge or Endorsement of the Hamilton Surveys

#### 1. The Roberts Claimants

Irvin Sewer's deposition testimony indicates that in 1983, he became aware of the Hamilton Surveys. After conducting research, he brought the surveys to the attention of elder members of the William and Martha George Family because he alleged that they showed an encroachment of Parcels 6A and 6E on to Parcel 6AB. (Irvin Sewer Dep. at 50–51). As a result, the William and Martha George heirs terminated their attorney, then Herbert Muriel, who had the surveys prepared. The heirs subsequently commenced a lawsuit to recover the family land. Additionally, Violet Sewer appears to have relied upon her brother Irvin for matters relating to the family land. (Violet Sewer Dep. at 40–41) Plaintiffs therefore argue that his knowledge of the surveys should be imputed to Violet.

#### 2. The Battiste Claimants

The Battistes' knowledge and endorsement of the Hamilton Surveys comes from deposition testimony of Herbert Muriel, Esquire, then attorney for both the heirs of William and Martha George and James Wellington George, under whom the Battistes claim. Muriel's testimony, as well as documents that he filed with the Court in connection with the probate of Beulah Battiste's estate, point to an express reliance by the Battistes upon Hamilton's Survey of Parcel 6AB, describing Parcel 6AB as consisting of 1.31 acres. (Dep. of Herbert Muriel at 118–37) ("Muriel Dep."); (*See also* Pls.' Br. Ex. D).

From 1980 to 1984, Attorney Muriel filed documents relating to the probate of

Beulah Battiste's estate and other Battiste ancestors for title to pass to Lyle, Leayle, and Lorne Battiste. (*Id.;* Pls.' Br. Ex. O, P). Muriel retained Hamilton to appraise the value of her estate, and his survey of Parcel 6AB became a basis for his sworn verification of the estate's value. (Muriel Dep. at 127; Pls.' Br. Ex. Q).

The record indicates that the Battiste estates expressly relied on Hamilton's survey of Parcel 6AB. (See Pls.' Br. Ex. D). This is evidenced by the Statement for Inheritance Tax Purposes filed by the Estate of James Wellington George, which describes Parcel 6AB as consisting of 1.31 acres, in accordance with Hamilton's survey. (Muriel Dep. at 128–29, Pls.' Br. Ex. O). In 1990, Beulah Battiste's Estate filed a Second Amended Inventory and Statement for Inheritance Tax Purposes, again describing the size of Parcel 6AB to be 1.31 acres, in conformity with Hamilton's survey.

In June, 1994, Karl Percell, Esquire, replaced Muriel as attorney for the Battiste and James Wellington George estates. (Muriel Dep. at 131; Pls.' Br. Ex. R). On March 13, 1998, Attorney Percell filed an Amended Final Account on behalf of the Beulah Battiste Estate, indicating no change from previously filed inventories. Leayle Battiste signed the Amended Final Account in his capacity as administrator of the estate. (Pls.' Br. Ex. S).

From this evidence representing almost twenty years of activity related to the probate of Beulah Battiste's estate, which descends from the Estate of James Wellington George, Plaintiffs claim that these estates have known of Hamilton's survey of Parcel 6AB Hansen Bay since at least 1981. They further suggest that these Defendants adopted and endorsed Hamilton's survey of 6AB in court filings not later than 1986. This occurred two years before the *Hoheb* Consent Judgment and

the deed to Plaintiffs for Parcel 6E, which relied upon the Hamilton 1981 Survey as a basis for the delineation of boundaries.

### G. *Violet Sewer's Adverse Possession Claim*

Apart from her claim of an interest in Parcel 6AB by virtue of inheritance from Emilie Roberts, Violet Sewer claims to have adversely possessed a portion of Plaintiffs' property by operating a campground there. Sometime around July or August of 1998, she had a survey prepared of Parcel 6AB that incorporated the Unrecorded Wells Survey. (Violet Sewer Dep. at 28–30; Def. Violet Sewer's Mem. in Opp. to Pls.' Mot. for Summ. J., Ex. 7, Survey Map No. D9–6588–T99). Thereafter, she placed wooden fence posts in the ground to demarcate the boundary as reflected in her prepared survey, but did not connect them with any fencing. (Violet Sewer Dep. at 61–63). She also placed a private property sign, a parking area sign, and a private camping sign on the property. (*Id.* at 78).

Violet Sewer testified that she has run a campground covering Parcel 6AB and an unspecified portion of 6E for an unspecified period of years, yet contends that she has run the campground area since approximately 1982 or 1983. (*Id.* at 81–84). She further claims to have constructed wooden platforms on which campers could put their tents, and states that she installed water tanks, a shower, and a toilet on the property, but did not specify the time period or dates that she installed these items. (*Id.*). Lastly, within the past few years, she has charged the public a fee for the use of the premises. (*Id.* at 94).

### H. *Issues for the Court*

Stripped to its core, the current motions present the following issues: (1) whether

the Hamilton's recorded surveys or the Wells Unrecorded Survey of Parcel 6AB identify the proper boundaries between Parcel 6AB and 6E and therefore constitutes the "original" survey; (2) whether any of Defendants knew of the proper boundary line, adopted it, or acquiesced to it, thereby precluding them from asserting any action to seek quiet title in their favor; and, (3) ultimately, whether Plaintiffs took fee simple title to Parcels 6E–1 and 6E–2 free of any issue concerning its boundaries.

After a careful, detailed review of the entire summary judgment record, including deposition testimony and exhibits presented by the parties, the Court now addresses the merits of the parties' legal arguments and factual contentions.

## II. SUMMARY JUDGMENT STANDARD

The standard for granting a motion for summary judgment is stringent but not insurmountable. To obtain summary judgment, a party must demonstrate the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir.1996). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or . . . vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

Here, Plaintiffs have the burden to prove that they are entitled to (1) a declaratory judgment confirming their title to Parcels 6E–1 and 6E–2 Hansen Bay; (2) the quieting of title; and (3) a permanent injunction enjoining Defendants from further trespass upon Parcels 6E–1 and 6E–2. As to Defendants' counterclaims or allegations which the Court has construed to constitute affirmative defenses, Defendants have the burden. Some of these counterclaims and affirmative defenses are inapplicable and not pertinent to the issues

before the Court.[6] Additionally, the Court rejects all other arguments raised by the parties not specifically addressed herein.[7]

## III. DISCUSSION

This case requires the Court to resolve legal issues primarily relating to Plaintiffs claim that the Hamilton Surveys constitute the original surveys of Parcels 6E–1 and 6E–2. The Court must first turn to its prior opinion in *Newfound, supra,* which clearly sets forth basic principles of surveying previously adopted by the Court.

### A. General Surveying Practices and the Importance of the Original Survey

In *Newfound,* the Court found that surveying in the East End of St. John presented unique problems when it stated:

The Virgin Islands challenges the contemporary surveyor in several ways, that in combination make a present-day surveyor's job quite demanding. First, sparsely populated areas often have not been surveyed in a systematic manner. Since the cost of surveying undeveloped land is often disproportionate to the value of the property, the surveying of rural areas, when conducted at all, has tended to produce scientifically imprecise surveys. This is particularly true of original surveys dating from the turn of the century or earlier. To further confound matters, early surveyors appear to have followed regional surveying practices based on custom. Second, the Danish history of the Islands complicates conducting historical research.

---

**6.** Defendants contend that Plaintiffs are barred by claim and issue preclusion from contesting the Unrecorded Wells Survey employed in the Alice Smith Sewer Lawsuit. Yet, while the Unrecorded Wells Survey refers to the boundaries of Parcel 6AB and was introduced into evidence, the boundary between 6E and 6AB was not in dispute, nor were the actual boundaries of 6AB. What was at issue in that case was the relationship between Parcel 6AB and Parcel 6ö–1. The court found that Parcel 6ö–1 took a portion of Parcel 6AB and Hamilton reflected this in his surveys by referencing Wells' recorded survey of Parcel 6ö–1. Thus, because the boundaries between 6E and 6AB were not at issue, claim preclusion does not apply. Moreover, issue preclusion does not bar Plaintiffs. A review of the documents in the Alice Smith Sewer lawsuit indicates that the content of the Wells Unrecorded Survey was not even litigated nor was it essential to the court's judgment that Alice Smith Sewer brought a successful claim for adverse possession. *See* Restatement (Second) Judgments § 27 cmt e (1980) ("A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action."). The Court was not required to determine the boundaries between 6AB and 6E to arrive at its result, and its judgment was not dependent upon such a determination.

*See id.* at cmt. h ("If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made."). For these reasons, the Court finds that preclusion doctrine does not bind Plaintiffs to the determination of the Unrecorded Wells Survey.

**7.** These include, *inter alia,* (1) Violet Sewer's allegation of a representational conflict of interest on the part of Herbert Muriel, Esquire, then attorney for the Estate of James Wellington George and the Newfound and Gulf Caribbean Corporation; (2) The Battistes' argument that their rights as "native indigenous landowners" have been violated by the Treaty of Cession, under which the Virgin Islands were transferred to the sovereignty of the United States by the Government of Denmark; or, allegations of discrimination in violation of 8 U.S.C. § 1406 and Article 6, Section 2 of the United States Constitution; and (3) Violet Sewer's allegation that a Stipulation of August 5, 1999, executed in connection with the Estate of William and Martha George, and signed by Maria Hodge, Esquire, counsel for Plaintiffs, acknowledges that Survey No. A9–282–T80 is in error.

Reviewing essential reference documents such as deeds and land lists is more intricate since the surveyor must first collect and perhaps translate old documents to trace ownership of property. Moreover, the Virgin Islands system of recording is idiosyncratic and requires some familiarity. Third, a warm climate, heavy vegetation and rough, often hilly, terrain in undeveloped areas slows a surveyor's team, making fieldwork difficult and time-consuming. *Newfound,* 885 F.Supp. at 751 (citations omitted).

Given these challenges, the Court noted that a surveyor should strive first to locate and examine all historical records, deeds, prior surveys, maps, and drawings in preparation for conducting an original survey. *Newfound,* 885 F.Supp. 727, 747 (citations omitted). The purpose of thoroughly researching the history of a parcel of land is to ensure that the surveyor will be able to incorporate the most complete and accurate data into his or her survey. *Id.* If a surveyor does not complete such research, the surveyor might perform the survey without having the benefit of essential information. *Id.* For instance, the surveyor might not adequately search for crucial monuments or might misinterpret other field or documentary evidence. *Id.* (citations omitted). In addition, if a surveyor knows that his or her survey will be used in a particular manner, a surveyor should review relevant documents and field surveys of adjacent parcels of land to ensure that his or her particular survey will be reliable and consistent with other existing surveys, so as to discourage litigation. *Id.*

After a surveyor has completed a comprehensive review of all available records, deeds and prior surveys, the surveyor begins the field survey. *Id.* Once in the field, the surveyor has a duty to make a diligent search for all monuments referenced directly or indirectly in the deed or property description that either occur naturally or were put in place by prior surveyors or other persons. *Id.* If necessary, the surveyor should consult former surveyors, landowners, residents, or other knowledgeable parties to determine monument sites or obtain other information tending to show where a piece of property should be located. *Id.* at 748. Testimony of neighbors and informed residents concerning boundaries is an important source of information for resurveys. *Id.* (citing *Maplesden v. U.S.,* 764 F.2d 1290, 1291 (9th Cir. 1985)).

The Court in *Newfound* further stated that "since the physical position of monuments referenced in a conveyance reflect the original boundaries of a particular parcel, a subsequent surveyor must attempt to conform his or her survey as closely as possible to the prior surveyor's work." *Id.* at 748. It cited with approval the generally accepted maxim in the law of surveying that "a surveyor must follow in the footsteps of the original surveyor." *See id.* "The purpose and result of this principle is to give effect to the intentions of the parties at the time of the survey as well as ensuring the continuity of boundaries over time." *Id.* "Accordingly, '[t]he general rule governing the determination of boundary lines by resurvey is that the intent of the new survey should be to ascertain where the original surveyors placed the boundaries, not to determine new modern boundaries.'" *Id.* (citation omitted). Therefore, as a matter of law, the original survey controls. *Id.* at 757.

### B. *Hamilton's Surveys*

Plaintiffs contend that because no original recorded survey lines existed for Parcels 6E or 6AB, Hamilton conformed his survey of these parcels to an ordering system of elements set forth in 28 V.I.C.

§ 47.[8] The relative importance of conflicting elements is, in descending order, (a) original surveyed lines; (b) natural monuments; (c) artificial monuments; (d) metes and bounds descriptions; (e) courses and distances; and (f) quantity and acreage. *Newfound,* 885 F.Supp. at 749.

The summary judgment record indicates that no original recorded survey lines existed for Parcels 6E or 6AB. Furthermore, no natural monuments existed to govern the survey of these parcels, save for a statement in the 1913 Agreement that Parcel 6AB was a reserved area of "about 2 acres" on South Side Bay East. Hamilton reflected this in both of his surveys, subject to the recognition of Parcel 6ö–1, which diminished the size of Parcel 6AB as a result of the Alice Smith Sewer Lawsuit. (*See* Pls.' Br. Ex. C, D; Hamilton Dep. at 84). He also noted the Wells Recorded Survey of Parcel 6ö–1 in both of his surveys. (Pls.' Br. Ex. C, D, F). Thus, from the record, it appears that Hamilton noted and confirmed his survey to all existing surveys of record for the adjoining property.

Hamilton found and reflected only one artificial monument-the fence around the Alice Smith Sewer Parcel. (Hamilton Dep. at 9). No information regarding metes and bounds, or courses and distances existed for either parcel, based on the 1913 Agreement. When Hamilton determined size and acreage, he found both parcels to be less than 2 acres each, which is smaller than the estimated sizes outlined by the 1913 Agreement. This is not fatal to the validity of Hamilton's surveys, however, because the Court has found that the 1913 Agreement "characterized descriptions of acreage as mere approximations," *Newfound,* 885 F.Supp. at 734, and that "quantitative elements, such as stated acreage, have the least relative importance." *Id.* at 750. "In the determination of boundaries of land, quantity or area has been variously declared, with qualifications ..., the least certain or reliable element of description, ... without weight or effect, ... the last element to be resorted to." *Id.* (citing 11 C.J.S. *Boundaries* § 57 (1938).

Hamilton testified that when he conducted his surveys, two elderly heirs of William

---

8. The statute reads in pertinent part:

The following are the rules for construing the descriptive part of a conveyance of real property when the construction is doubtful and there are no other sufficient circumstances to determine it:

(1) Where there are certain definite and ascertained particulars in the description, the addition of others which are indefinite, unknown, or false does not frustrate the conveyance, but it is to be construed by such particulars, if they constitute a sufficient description to ascertain its application.

(2) When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount.

(3) Between different measurements which are inconsistent with each other that of angles is paramount to that of surfaces and that of lines paramount to both.

(4) When a road or stream of water not navigable is the boundary, the rights of the grantor to the middle of the road or the thread of the stream are included in the conveyance, except where the road or bed of the stream is held under another title.

(5) When the shoreline is the boundary, the rights of the grantor to the line of mean high tide, subject to the right of the public to make reasonable recreational use of the shoreline, as "shoreline" is defined in section 402 of chapter 13 of Title 12 of this Code, are included in the conveyance.

(6) When the description refers to a map, and that reference is inconsistent with other particulars, it controls them, if it appears that the parties acted with reference to the map; otherwise the map is subordinate to other definite and ascertained particulars.

and Martha George, Vitalia Boynes and Alicia Penha, now deceased, accompanied him to the area and pointed out their family land to him as he was preparing to conduct his survey of Parcel 6E and 6AB. (Hamilton Dep. at 7, 82–83, 103). Irvin Sewer claims, however, that he knew Boynes and Penha personally, and that they told him that they had never visited St. John as adults because Bones did not like to travel by sea. (*See* Aff. of Irvin A. Sewer in Supp. of Resp. to Pls.' Mot. for Summ. J. at ¶¶ 2,9 ("Irvin Sewer Aff."); Aff. of Guy Benjamin, Irvin Sewer's Resp. to Pls.' Mot. for Summ. J., Ex. 5, at ¶ 5 ("[T]o the best of my knowledge, and I have not heard anyone say otherwise, she [Boynes] never went back to St. John—not even to visit or attend funerals or acquaintances, friends or relatives.").

From the claims made in these affidavits, Sewer contends that Boynes and Penha could not have accompanied Hamilton to show him the boundaries of their property. (*Id.* at ¶ 11). The Court, however, determines these particular statements to be unavailing hearsay statements from deceased people, and, they are therefore inadmissible pursuant to Fed.R.Evid. 803. Both Benjamin and Sewer lack personal knowledge as to whether Boynes or Penha accompanied Hamilton, whereas Hamilton testified from personal knowledge that Boynes and Penha accompanied him to the survey site. Moreover, Irvin Sewer does not argue and the Court does not find that any exception to the hearsay rule applies. Of greater significance to the Court, however, is the Court's previous holding that statements of "old-timers" possessing knowledge of the land and its boundaries are a proper element for a surveyor to use

when documentation is inadequate. *See Newfound,* 885 F.Supp. at 762. *See id.* at 756 ("Owners of property presumptively know what they own and their lands' boundaries.") (citations omitted).

### C. *Contentions of the Parties*

It is Defendants' position that Hamilton is charged with knowledge of the Unrecorded Wells Survey, that Wells was the original surveyor, and that Hamilton was obligated to extract an exhibit from the Court's closed file to "follow in its footsteps." Defendants further contend that the entire bay belongs to Parcel 6AB and that it does not share the bay with Parcel 6E, as reflected in the Unrecorded Wells Survey. (*See* Pls.' Br. Ex. E). An examination of the Unrecorded Wells Survey indicates that Parcel 6AB covers the entire bay, rather than sharing it with Parcel 6E. (*Id.;* Def. Violet Sewer's Mem. in Opp. to Pls.' Mot. for Summ. J., Ex. 7). Plaintiffs maintain, however, that this is inconsistent with the language of the 1913 Agreement, which indicates that the five signatory families to the agreement intended to reserve particular areas at the bay, rather than reserve the entire bay.[9] (*See* Pls.' Br. Ex. T, H). They further contend that the Unrecorded Wells Survey of Parcel 6AB, taken from the records of the Court in the Alice Smith Sewer lawsuit cannot be considered authoritative, because it was not a matter of public record, and the reasons for the Wells' failure to record the survey raises questions concerning its reliability. The Court agrees with Plaintiffs.

From the record, the Court determines that no genuine issue of material fact exists as to the validity and accuracy of Hamilton Surveys of Parcel 6E. Hamilton

---

9. As to Parcel 6AB, the 1913 Agreement states in relevant part:

It is however understood that there are 3 Bays on the land here sold, namely one on the North side and two on the south side. At *each Bay is reserved ab. 2 acres of land,* which are not included in the sale but remains belonging to us. (emphasis added).

surveyed Parcels 6E in accordance with established surveying practices. He properly drew conclusions from available historical documents, informed testimony of the property owners, and his own investigative fieldwork. He took into account all existing surveys of record for adjoining property, including the Wells Recorded survey of Parcel 6ö–1. Defendants argue that there is no law that requires that a survey be recorded for it to be a valid and effective instrument, and therefore the Unrecorded Wells Survey controls. Yet, for a surveyor to conscientiously "follow in its footsteps," some form of notice is required.

Notice may be actual or constructive, and actual notice may be express or implied. *See* 58 Am.Jur.2d Notice §§ 6, 7 (1989). Constructive notice is a legal fiction designed to impute notice to a person not having actual notice where that person has knowledge of certain facts which should lead him to the ultimate fact. *See id.* §§ 8, 9 (1989). Constructive notice frequently arises from the existence of a record, like a recorded instrument. *See id.* § 9; 28 V.I.C. § 124 (Michie 1997). Express actual notice "consists of knowledge actually delivered into the hands of a person." *Bennerson v. Small,* 23 V.I. 113, 116 (D.V.I.1987). Actual notice "must be complete in every material constituent part, and the party to be legally bound by it must have actually received it." *Rubin v. Johns,* 21 V.I. 525, 531 (Terr.Ct.1985).

■ Looking at the evidence in the light most favorable to Defendants, there is no evidence to suggest that Hamilton had either actual or constructive notice of the Wells Unrecorded Survey. Defendants have not put forth any evidence to suggest that the Hamilton surveys are inaccurate or unreliable, nor do they dispute Hamilton's testimony that he was unaware of the Wells Unrecorded Survey. Defendants

merely allege that he did not follow in its footsteps. For these reasons, as well as those stated above, the Court recognizes Survey Map No. A9–282–T80 of Parcel 6E and Subdivision Survey Map No. D9–1725–T81 of Parcels 6E–1 and 6E–2 as the original surveys of said parcels. Furthermore, the Court finds that these surveys correctly establish the boundary lines between Plaintiffs' property and any property owned by any of Defendants claiming an interest in abutting land.

■ Having resolved the issue that the Hamilton Surveys are the original surveys of Parcel 6E and the subdivision thereof, the Court further finds that no genuine issue of fact exists that Plaintiffs, as bona fide purchasers, took proper title to Parcels 6E–1 and 6E–2. Because Hamilton did not have notice of the Unrecorded Wells Survey, it follows that Hamilton's lack of notice should be imputed to Plaintiffs. It is clear from the evidence that Plaintiffs were bona fide purchasers for value who purchased Parcels 6E–1 and 6E–2 for substantial consideration and relied upon Hamilton's publicly recorded surveys of that property. Plaintiffs submitted their duly recorded deed from the Clerk of the Court acting as trustee of the parties with title to the property, including the heirs of William and Martha George. By reference to the 1913 Agreement, Plaintiffs have further demonstrated to the Court that the property designated Parcel 6E was owned exclusively by the heirs of William and Martha George.

For the above reasons, the Court is unwilling to undercut the expectations of Plaintiffs as good faith purchasers because there is no clear evidence that Hamilton's surveys are in error. *See Newfound,* 885 F.Supp. at 766, n. 40 ("Under certain conditions, a surveyor could alter survey lines ... provided such a change would not undercut the settled expectations of subse-

quent goodfaith purchasers or adjacent owners. This sort of change would be appropriate where clear evidence suggests that a surveyor has made an error that should be corrected."). The grant of summary judgment in favor of Plaintiffs is therefore proper.

### D. *Laches*

Both Plaintiffs and Defendants raise the affirmative defense of laches. The Court prefers to reach the issues in this case on the merits, having found that the uncontroverted facts demonstrate that the Hamilton surveys are the proper surveys that delineate the boundaries between Parcels 6E and the adjoining properties. The Court therefore concludes it unnecessary to base its holding primarily on an equitable doctrine such as laches.

Nevertheless, there is significant evidence in the summary judgment record to indicate that Defendants possess longstanding actual or constructive knowledge of the Hamilton Surveys. The evidence is compelling enough that the Court finds that Defendants are barred from challenging the Hamilton Surveys.

 Laches bars an action from proceeding if there was an inexcusable delay in bringing suit, and material prejudice to the party as a result of the delay. *See Pappan Enterp. v. Hardee's Food Sys.*, 143 F.3d 800, 804 (3d Cir.1998). Application of the laches doctrine is left to the sound discretion of the trial court, and cannot be disturbed absent an abuse of discretion. *Grobien v. Lombardi*, 26 V.I. 307, 312 (D.V.I.App.1991).

 Irvin Sewer's deposition testimony indicates he became aware of the Hamilton surveys in 1983. Indeed, he brought the surveys to the attention of some elder members of the William and Martha George Family because he felt that the

Hamilton surveys showed an encroachment of Parcels 6A and 6E on to Parcel 6AB. (Irvin Sewer Dep. at 50–51). In addition, Violet Sewer relied upon her brother Irvin for matters relating to the family land. (Violet Sewer Dep. at 40–41). Therefore she is charged with her brother's knowledge of the surveys.

The Court finds the Battistes' challenge to the Hamilton Surveys incomprehensible. They possessed actual or constructive knowledge of the Hamilton Surveys as early as 1981 when they employed Hamilton to survey their own property. They adopted the acreage calculations in Hamilton's survey of Parcel 6AB to appraise the value of Beulah Battiste's estate, and, in filings with the Court, Hamilton's survey of Parcel 6AB became a basis for his sworn verification as to the estate's value. (Muriel Dep. at 127; Pls.' Br. Ex. O, Q, R, S). In addition, Lyle and Lorne Battiste, appearing individually clearly lack standing to challenge the surveys because their interests are represented by Leayle Battiste in his capacity as administrator of Beulah Battiste's estate. *See* 15 V.I.C. § 311.

Defendants' deposition testimony and documentary evidence in the record demonstrates that they have known of these surveys for almost twenty years. The Court therefore finds that there has been an inexcusable delay in their effort to challenge the demarcation of boundaries between 6E and 6AB.

As to the prejudice prong, the Court finds that Plaintiffs have suffered prejudice because Defendants delayed filing suit to resolve boundary issues concerning the parcels. *See, e.g., Schindel v. Pelican Beach Inc.*, 16 V.I. 237, 257 (1979) (barring plaintiff under laches doctrine from obtaining removal of beach club's tennis courts, where although plaintiff immediately put defendants on notice of violation of restric-

tive covenant in deed, she did not file suit for seven years). Defendants, as adjoining land owners, were clearly in a better position to have knowledge of the surveys than Plaintiffs, and, these issues could have been resolved long before Plaintiffs purchased Parcel 6E. As good faith purchasers, Plaintiffs paid $460,000 for the property in reliance on a deed issued by the Court pursuant to a Consent Judgment. It appears that over an unspecified period of time, Plaintiffs exchanged correspondence with Violet Sewer in an effort to amicably work out any problems between them concerning the boundaries of the parcels. (*See, e.g.,* Def. Irvin A. Sewer Resp. to Pls.' Mot. For Summ. J. at Ex. 9). However, when relations between the parties deteriorated further, Plaintiffs were forced to bring suit because Violet Sewer began to lay claim to a portion of Parcel 6E by installing fenceposts. As a result, the Court finds that Plaintiffs have suffered prejudice by incurring significant costs to bring this litigation because of Defendants' acts. The Court is satisfied that Plaintiffs have met the requirements to maintain a claim for laches and concludes that Defendants' laches argument is without merit. Defendants' affirmative defenses and counterclaims are therefore barred.

### E. *Violet Sewer's Adverse Possession Claim*

As stated above, Violet Sewer claims that her possession of a portion of land within Parcel 6E's boundaries has ripened into ownership. In the Virgin Islands, title by adverse possession is conclusively presumed upon a showing of "[t]he uninterrupted, exclusive, actual, physical, adverse, continuous, notorious possession of real property under claim or color of title for 15 years or more...." 28 V.I.C. § 11; *Burnett v. Benjamin,* No. 348–1995, 2002 WL 359994 at *3 (Terr.V.I. Feb. 8,

2002), *Griles v. Griles,* 1998 WL 707773 (Terr.Ct.1998). Under Virgin Islands law, an adverse claimant bears the burden of proof to prove all elements of the claim to the property by clear and convincing evidence. *McNamara v. Christian,* 26 V.I. 109, 112 (Terr.Ct.1991). The question of whether an adverse claimant has met this burden is a question for the trier of fact. *DeCastro v. Stuart,* 43 V.I. 115, 119 (Terr.Ct.2000) (citing *McNamara v. Christian,* 26 V.I. 109, 112 (Terr.Ct.1991); *Griles v. Griles,* 39 V.I. 135, 137 (Terr.Ct.1998)). To make this determination, a court must look for evidence of "acts on land as ordinarily an owner would do, such as construction of buildings and making of improvements, or the payment of taxes." *See id.* (citing *McNamara,* 26 V.I. at 113).

After Violet Sewer had a survey prepared in July or August of 1998, she placed wooden fence posts in the ground, but did not connect them with any fencing. (Violet Sewer Dep. at 61–63). She also placed various signs around the property. (*Id.* at 78). She alleges that she has run a campground covering Parcel 6AB and an unspecified portion of 6E for an unspecified period of years, contending, however, that she has run it since approximately 1982 or 1983. (*Id.* at 81–84). She claims to have constructed wooden platforms on which campers could put their tents, and installed water tanks, a shower, and a toilet on the property, but did not specify the time period over which these items were installed. (*Id.*). Lastly, within the past few years, she has charged the public a fee to use the premises. (*Id.* at 94).

The Court determines that on these facts, Violet Sewer's adverse possession claim fails as a matter of law because she has not met the requirements set forth in 28 V.I.C. § 11. She fails to establish by clear and convincing evidence that she has

had exclusive, continuous, and uninterrupted possession of a portion of Parcel 6E over the required statutory period of fifteen years.

■■■ Violet Sewer's possession is not hostile and adverse. Possession of real property by an adverse claimant must not only be without subserviency to, or recognition of, the title of the true owner, but it must be hostile to the whole world. *Fleming v. Frett*, 33 V.I. 59, 61 (Terr.Ct.1995) (citing *Cakebox Bakery, Inc. v. Maduro*, 15 V.I. 283 (Terr.Ct.1978). There is no fixed rule or mechanical formula by means of which the Court can determine if possession is hostile. *Tutein v. Daniels*, 10 V.I. 255, 260 (Terr.Ct.1973). However, "a hostile claim of right is present when one does such acts on land 'as ordinarily only an owner would do, such as the construction of buildings and making of improvements or the payment of taxes....'" *McNamara*, 26 V.I. at 112–13 (quoting *Tutein v. Daniels*, 10 V.I. at 261). Violet Sewer has not performed such acts that could be characterized as those that a true owner would perform.

Lastly, she has not met her burden to demonstrate that her possession is "open and notorious" within the meaning of 28 V.I.C. § 11. The words " 'open and notorious possession,' as applied to the adverse holding of land by another, mean that the adverse claim of ownership must be evidenced by such conduct as is sufficient to put a man of ordinary prudence on notice of the fact that the land in question is held by the claimant as his own." 3 AM. JUR. 2D Adverse Possession § 69 (1986). "Open and notorious possession contemplates possession that is unconcealed and so conspicuous that it is generally known by the public or by people in the neighborhood." 39 AM. JUR. Proof of Facts "Adverse Possession" § 8 (1984); *Fleming*, 33 V.I. at 62.

The Court in *DeCastro v. Stuart* found a legitimate claim by adverse possession where the adverse claimant made substantial improvements to the property including clearing the land, building a four-room structure with a concrete foundation, installing electricity and plumbing fixtures, erecting a fence around the property, and cultivating the land. *DeCastro*, 43 V.I. at 123–24. He held himself out to his neighbors as the owner of the property and sold the bounty of the land to the local community. *Id.* at 124. The court found that the manner in which DeCastro possessed the land was sufficient to provide the true owner with notice that someone was claiming an interest in the property. *Id.*

In contrast, Violet Sewer's claim of ownership is somewhat similar to the level of improvement performed by the adverse claimant in *McNamara v. Christian*, 26 V.I. 109 (Terr.Ct.1991). In *McNamara*, the adverse claimant built a tool shed, kept his dog on the property, constructed a chain link fence, and posted a no trespassing sign. The court held that this was not adverse possession since no significant improvements or substantial permanent structures were erected. *Id.* at 113. Here, Violet Sewer's alleged improvements include the installation of wooden fence posts, platforms for tents, some signs, a toilet, shower, and water tank. The Court does not view these improvements to be substantively permanent or of any significant import to constitute improvements for purposes of adverse possession.

In sum, Violet Sewer has not undertaken acts which manifest adverse, continuous, and notorious possession. Finding no genuine issue of material fact, the Court will grant summary judgment in favor of Plaintiffs on Defendant Violet Sewer's counterclaim.

## IV. CONCLUSION

For the reasons stated herein, Defendant Irvin Sewer's Motion for Summary Judgment is denied and Plaintiffs' Motion for Summary Judgment is granted. An appropriate Order will be entered.

**THIS MATTER** having come before the Court on Motions for Summary Judgment filed by Martin B. Netsky and Tangara E. Netsky ("Plaintiffs"), and Irvin A. Sewer ("Defendant"); and,

The Court having considered the submissions of the parties, and,

The Court having heard oral argument on the Motions for Summary Judgment on February 20, 2002, and, for the reasons stated in the Court's Opinion filed concurrently with this Order;

**IT IS** on this 16th day of May 2002, hereby

**ORDERED** that the Defendant's Motion for Summary Judgment is **DENIED** and that Plaintiffs' Motion for Summary Judgment is **GRANTED**; and

**IT IS FURTHER ORDERED** that pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Virgin Islands Declaratory Judgment Act. V.I. CODE ANN. TIT.5 §§ 1261–1272, Plaintiffs' Request for a Declaratory Judgment, as set forth in Count One of Plaintiffs' Complaint, is hereby **GRANTED**; and,

**IT IS FURTHER ORDERED, AD-JUDGED**, and **DECREED** that:

(1) The District Court of the Virgin Islands, in the case captioned *Hoheb v. Muriel, et al.*, Civ. No.1983–85, had full authority to enforce the sale of Parcel Nos. 6E–1 and 6E–2; and,

(2) The Clerk of the Court validly executed the Deed to Parcel Nos. 6E–1 and 6E–2 to Plaintiffs on August 30, 1988, in accordance with the Consent Judgment entered into on April 7, 1988, and, it was properly recorded in the Registry of Property of the Virgin Islands Recorder of Deeds on October 12, 1988; and,

(3) Pursuant to the Deed of Sale, Plaintiffs, as bona fide purchasers, in good faith, for value, and without actual or constructive notice of any outstanding equity or adverse interest or title in any defendant or other person, took unimpaired fee simple title to property consisting of Parcels 6E–1 and 6E–2, Estate Hansen Bay, East End Quarter, St. John, U.S. Virgin Islands, comprising 1.76 U.S. Acres as more particularly shown on P.W.D. Map Nos. A9–282–T80 and D9–1725–T81; and,

(4) The Court **ACCEPTS** and **APPROVES** Survey Map No. A9–282–T80 of Parcel 6E and Subdivision Survey Map No. D9–1725–T81 of Parcels 6E–1 and 6E–2 as the original surveys of said parcels and as correctly establishing the boundary lines between Plaintiffs' property and any property owned by any of Defendants who claim an interest in abutting land; and,

(5) Survey Map No. D9–6588–T99, having been prepared by Defendant Violet Sewer, does not correctly set the boundary between Plaintiffs' property and any property owned by any of Defendants claiming an interest in abutting land; and,

(6) None of Defendants, nor any other person, save Plaintiffs, have any ownership interest in the land described as Parcels 6E–1 and 6E–2 Estate Hansen Bay as depicted in Survey Map No. A9–282–T80 and Subdivision Survey Map No. D9–1725–T81; and,

IT IS FURTHER ORDERED that pursuant to Count Two of Plaintiffs' Complaint, title to

Parcels 6E–1 and 6E–2 is hereby **QUIETED** in favor of Plaintiffs in accordance with the boundary determinations as more fully described and set forth in P.W.D. Map Nos. A9–282–T80 and D9–1725–T81; and,

IT IS FURTHER ORDERED that pursuant to Count Three of Plaintiffs' Complaint, Plaintiffs' request for permanent injunctive relief is hereby **GRANTED**, and Defendants are hereby **ENJOINED** from entering or conducting any activity on Plaintiffs' premises except to remove the fence and any other materials that Defendant Violet Sewer has constructed on Plaintiffs' property.[1]

---

1. Defendant Violet Sewer is ordered to remove these items from Plaintiffs' property within thirty (30) days of the date of this Order.