**ANDREW SIMPSON and RICHARD J. RIDGWAY,**
**Appellants/Defendants**

**v.**

**GOLDEN RESORTS, LLLP, Appellee/Plaintiff**

S. Ct. Civil No. 2011-0069

Supreme Court of the Virgin Islands

April 13, 2012

599

ANDREW C. SIMPSON, ESQ., Andrew C. Simpson, P.C., St. Croix, USVI, *Attorney for Appellants.*

LEE J. ROHN, ESQ., Law Offices of Rohn & Carpenter, LLC, St. Croix, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(April 13, 2012)

HODGE, *Chief Justice.* Appellants Andrew C. Simpson and Richard J. Ridgway (collectively "Appellants") appeal from the Superior Court's August 4, 2011 Order enjoining Ridgway "from going on or causing or allowing his livestock to go on" various properties in East End Quarter "A" on St. Croix (hereafter "disputed property")[1] and enjoining Appellants from claiming title to the disputed property, based solely on an

---

[1] These properties include Matricular Nos. 53, 54, 55, and 57 as well as Rem Matricular No. 52 of Estate Hartmans, and Matricular Nos. 47 and 56 of Estate Great Pond, totaling nearly 300 acres.

earlier grant of summary judgment to Appellee Golden Resorts, LLLP. For the reasons that follow, we reverse the summary judgment award, and accordingly vacate the permanent injunction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 22, 2008, Golden Resorts filed a complaint against Appellants, which the Superior Court docketed as Super. Ct. Civ. No. 109/2008 (STX). In its complaint, Golden Resorts requested a declaratory judgment declaring that it possessed title to the disputed property and that Ridgway had not obtained title to it through adverse possession, an injunction enjoining Ridgway from trespassing on the disputed property, and sought money damages for slander of title, tortious interference with contract, and trespass. Appellants did not answer the complaint, but filed a motion for a more definitive statement on February 29, 2008. While that motion remained pending, Ridgway — represented by Simpson — filed his own complaint against Golden Resorts on June 5, 2008, which the Superior Court docketed as Super. Ct. Civ. No. 284/2008 (STX). Although Appellants had not yet answered its complaint, Golden Resorts filed a motion for summary judgment in Super. Ct. Civ. No. 109/2008 (STX) on September 29, 2008, which Appellants jointly opposed.

The Superior Court consolidated both cases on April 8, 2009, and on October 20, 2009 held a hearing on the motion for summary judgment. In an opinion signed on April 9, 2010 and entered by the clerk on April 12, 2010, the Superior Court entered summary judgment in favor of Golden Resorts, on the grounds that Ridgway had failed to introduce sufficient evidence to allow a reasonable trier of fact to conclude that he adversely possessed the disputed property. After Appellants filed a motion for reconsideration, the Superior Court issued an April 27, 2011 Opinion, which denied the reconsideration motion but outlined additional reasons for entering summary judgment with respect to the adverse possession issue. On May 13, 2011, the Superior Court issued an Amended Opinion, *nunc pro tunc* to April 27, 2011, to include exhibits that had inadvertently been omitted from the April 27, 2011 Opinion. On August 4, 2011, the Superior Court entered an order enjoining Ridgway "from going on or causing or allowing his livestock to go on" the disputed properties, and enjoining Ridgway and Simpson "from claiming any ownership interest

in said property." (J.A. 17.)[2] Appellants timely filed their notice of appeal on August 16, 2011. 4 V.I.C. § 33(d)(5).

## II. DISCUSSION

### A. Jurisdiction

Prior to considering the merits of an appeal, this Court must first determine if it has appellate jurisdiction over the matter. *V.I. Gov't Hosp. & Health Facilities Corp. v. Gov't*, 50 V.I. 276, 279 (V.I. 2008). In this case, this Court unquestionably possesses jurisdiction over the August 4, 2011 Order pursuant to section 33(b)(1) of title 4 of the Virgin Islands Code, which grants this Court jurisdiction over appeals from "[i]nterlocutory orders of the Superior Court . . . granting, continuing, modifying, or refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." However, in their brief, Appellants do not frame their arguments in terms of reversing the August 4, 2011 Order, but rather only contend that they believe the Superior Court erred in granting summary judgment to Golden Resorts on the adverse possession claim. Accordingly, in its brief, Golden Resorts argues that this Court lacks jurisdiction over this appeal because Appellants are attempting "to bootstrap appellate jurisdiction over the interlocutory summary-judgment orders by merely referencing entry of the unopposed, separate injunction order . . . without actually seeking review or reversal of the order granting injunctive relief." (Appellee's Br. 2.)

 We conclude that this Court possesses jurisdiction over this appeal. As we have recently explained,

> an appellate court may, "in certain cases, exercise pendent appellate jurisdiction over issues not otherwise appealable." *Invista S.Á.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 88 (3d Cir. 2010). "The doctrine of pendent appellate jurisdiction, in its broadest formulation, allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its ju-

---

[2] It is not clear from the record why the Superior Court directed this portion of the injunction towards Simpson, given that Golden Resorts did not allege in its complaint that Simpson had ever claimed to own any portion of the disputed property, and the evidence clearly establishes that only Ridgway has claimed to have obtained title through adverse possession.

risdiction." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 202-03 (3d Cir. 2001) (citations omitted). "Issues are 'inextricably intertwined' only when the appealable issue cannot be resolved without reference to the otherwise unappealable issue." *Invista*, 625 F.3d at 88 (quoting *American Soc'y for Testing & Materials v. Corrpro Cos., Inc.*, 478 F.3d 557, 580-81 (3d Cir. 2007)). However, some courts have held that the "inextricably intertwined" standard also allows an appellate court to exercise pendent appellate jurisdiction if "resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Batzel v. Smith*, 333 F.3d 1018, 1023 (9th Cir. 2003).

*People v. Ward*, 55 V.I. 829, 839 (V.I. 2011). While Golden Resorts contends that this Court should rely on the reasoning of *Kershner v. Mazurkiewicz*, 670 F.2d 440 (3d Cir. 1982) to hold that Appellants cannot appeal the summary judgment award as part of this appeal, Golden Resorts — which does not address *Ward* in its brief even though the decision was issued almost two months before its brief was filed — fails to acknowledge that, in *Kershner*, the United States Court of Appeals for the Third Circuit had declined to review the merits of a denial of class certification as part of an appeal of a denial of a preliminary injunction because, although both issues were addressed in the same order, the denial of class certification did not "directly control[]" the denial of a preliminary injunction, and thus "[t]he two issues [we]re separate and distinct" and "in no way can they be said to be 'inextricably bound.' " 670 F.2d at 450. In this case, the August 4, 2011 Order expressly states, on its face, that the Superior Court is issuing the injunction because it granted summary judgment to Golden Resorts on the adverse possession claim, (J.A. 16), and Appellants, in both their principal and reply briefs, have expressly invoked the August 4, 2011 Order's incorporation of the Superior Court's prior decisions as the basis for this Court's appellate jurisdiction over an otherwise non-appealable grant of partial summary judgment.[3] Thus, consistent with its reasoning in *Ward*, we shall consider

---

[3] It is worth noting that, in its August 4, 2011 Order, the Superior Court observed that Appellants had never appealed the Superior Court's grant of summary judgment. However, because the Superior Court only entered partial summary judgment, and did not fully resolve all claims between Golden Resorts and Appellants, this Court would have lacked jurisdiction over any appeal filed after entry of either the April 12, 2010 Opinion, the April 27, 2011 Opinion, or the May 13, 2011 Amended Opinion.

the merits of the Superior Court's summary judgment decision as part of this appeal.

## B. Standard of Review

"This Court exercises plenary review of a Superior Court's grant of summary judgment." *Williams v. United Corp.*, 50 V.I. 191, 194 (V.I. 2008) (citing *Maduro v. American Airlines, Inc.*, S.Ct. Civ. No. 2007-029, 2008 V.I. Supreme LEXIS 24, at *7 (V.I. Feb. 28, 2008) (unpublished)). "On review, we apply the same test that the lower court should have utilized." *Id.* "Because summary judgment is a drastic remedy, it should be granted only when 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Id.* (quoting FED. R. CIV. P. 56(c)) (citations omitted). "When reviewing the record, this Court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party, and we must take the non-moving party's conflicting allegations as true if 'supported by proper proofs.' " *Id.* (quoting *Seales v. Devine*, S.Ct. Civ. No. 2007-040, 2008 WL 901528, at *1 (V.I. Mar. 3, 2008) (unpublished)). "[T]o survive summary judgment, the nonmoving party's evidence must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (internal quotations omitted). Importantly, the nonmoving party may not rest on its pleadings but "'must set forth specific facts showing that there is a genuine issue for trial.'" *Bright v. United Corp.*, 50 V.I. 215, 222 (V.I. 2008) (quoting *Saldana v. Kmart Corp.*, 43 V.I. 361, 364-65, 260 F.3d 228, 232 (3d Cir. 2001)).

## C. The Summary Judgment Award

■ As this Court has previously explained,

Title 28, section 11 of the Virgin Islands Code defines adverse possession as "[t]he uninterrupted, exclusive, actual, physical adverse, continuous, notorious possession of real property under claim or color of title for 15 years or more . . . ." In addition, the claimant's possession must be hostile to the whole world, *i.e.* she must perform acts on the land which customarily only an owner would perform. *Netsky v. Sewer*, 205 F. Supp. 2d 443, 460 (D.V.I 2002). In the Virgin Islands, it

is the duty of the trier of fact to determine whether the claimant has met his burden of proving the required elements by clear and convincing evidence. *Id.* at 459.

*Hodge v. McGowan*, 50 V.I. 296, 315 (V.I. 2008). According to Appellants, the Superior Court applied the wrong legal standard when it entered summary judgment in favor of Golden Resorts because, rather than viewing the evidence in the light most favorable to Appellants, it usurped the role of the trier of fact by making credibility determinations and otherwise weighing the evidence. Golden Resorts, however, contends that the Superior Court properly applied the summary judgment standard and that it met its burden of establishing the absence of any genuine issues of material fact with respect to the elements of an adverse possession claim. We disagree.

### 1. *Actual, Physical, and Hostile Possession*

■ In its May 13, 2011 Opinion, the Superior Court correctly recognized that, for purposes of an adverse possession claim, "[a]ctual possession . . . is not commensurate with occupancy." (J.A. 37 (quoting *Sasso v. Hackett*, 45 V.I. 375, 381 (V.I. Super. Ct. 2004))). The Superior Court, however, proceeded to conclude that "to establish actual, physical possession a party must prove activities such as the 'construction of buildings and making of improvements.' " (*Id.* (quoting *Cabrita Point Dev. v. Evans*, 52 V.I. 968, 983 (D.V.I. 2009)). Applying this standard, the Superior Court held that "Ridgway constructed no significant improvements to the claimed property by merely erecting fences, digging wells, grazing his herd of cattle, and posting no trespassing signs," since "[a]ll of these activities did not improve the property or its value . . . but rather only facilitated his commercial venture of dairy farming." (J.A. 41.)

■ The Superior Court erred as a matter of law in requiring the construction of buildings or other improvements to establish the actual possession element of adverse possession. The "construction of buildings and making of improvements" language from *Cabrita*, which the Superior Court relied upon in its May 13, 2011 Opinion, originated in an earlier District Court case, and was presented in the following context:

> The acts required to accomplish adverse possession will, of course, vary depending upon the nature of the property itself and the uses to

which it is adaptable. A barren tract of land might be reduced to possession, hostile to the ownership of the record titleholder, by merely erecting a fence. Yet, a piece of city land suitable for commercial use might require more definitive acts before one could be said to have hostilely asserted his or her claim of right. *For the purposes of this case*, it seems sufficient to hold that a hostile claim of right is present when one does such acts on land "as ordinarily only an owner would do, such as construction of buildings and making of improvements, or the payment of taxes."

*Tutein v. Daniels*, 10 V.I. 255, 260-61 (D.V.I. 1973) (emphasis added and citations omitted). *See also Holley Homestead Trust v. Harrison*, 11 So.3d 511, 517 (La. Ct. App. 2009) ("what constitutes adverse possession depends on the nature of the property and must be determined on the facts of each case."); *LaChance v. First Nat'l Bank & Trust Co.*, 301 Mass. 488, 17 N.E.2d 685, 687 (Mass. 1938) ("The nature and the extent of occupancy required to establish a right by adverse possession vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put."); *Fry v. Woodward*, 221 Ore. 39, 350 P.2d 183, 185 (Or. 1960) ("What constitutes possession necessarily depends upon the type of use to which the land is suited."). In other words, the *Tutein* decision expressly recognized that the nature of a particular piece of land is highly relevant to this element of an adverse possession claim, and — rather than establishing a *per se* rule that constructing buildings or improving the property is always required to prove actual, hostile possession — simply acknowledges that, with respect to that particular case, evidence of these activities was sufficient to establish that element. Therefore, the Superior Court erred when it held that Ridgway cannot satisfy the actual possession element of his adverse possession claim without constructing buildings or otherwise actually improving the property. *See, e.g., Potlatch Corp. v. Richardson*, 278 Ark. 498, 647 S.W.2d 438, 438-39 (Ark. 1983) (fence not necessary for adverse possession, as long as there is a visible and notorious act of ownership conveying knowledge, or presumed knowledge, to true owner); *Tucker v. Hankey*, 173 Kan. 593, 250 P.2d 784, 788 (Kan. 1952) ("To constitute adverse possession of land, it is not absolutely necessary that there should be [e]nclosure, buildings, or cultivation. . . .").

██ ██ With respect to agricultural lands whose primary purpose is cattle grazing, courts have consistently held that the actual, physical, and

hostile possession elements of an adverse possession claim may be satisfied simply upon a showing that the individual who claims to have adversely possessed the land has had his cattle graze on the disputed parcel. *See, e.g., Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434, 438 (Neb. 1993); *Davis v. Parke*, 135 Ore. App. 283, 898 P.2d 804, 806 (Or. Ct. App. 1995); *Overson v. Cowley*, 136 Ariz. 60, 664 P.2d 210, 217-18 (Ariz. Ct. App. 1982) (holding cattle grazing, without more, sufficient to establish actual possession element). As the Wyoming Supreme Court, in summarizing how the common law has developed with respect to adverse possession claims based on livestock grazing, has succinctly summarized:

> In cases in which the adverse possession claimant rests its claim on the grazing of livestock on the disputed property, material facts include whether the property is suitable for grazing and pasturage, whether the grazing livestock were placed on the adverse claimant's own lands and then roamed freely or strayed onto the disputed property or whether the adverse claimant purposely drove its livestock onto the disputed property and kept them there each year during the full period of the growing season, whether the adverse claimant pastured its grazing livestock on the disputed property sporadically or for the full period of each growing season, whether the disputed property was separately enclosed with its own fence and the adverse claimant placed its grazing livestock within that fenced enclosure, and the number of such grazing livestock using the disputed property for the full period of each growing season.

*Braunstein v. Robinson Family Ltd. P'ship LLP*, 2010 WY 26, 226 P.3d 826, 835 (Wyo. 2010) (collecting cases).[4]

---

[4] In both of its opinions, the Superior Court relies heavily on this Court's decision in *Hodge v. McGowan*, 50 V.I. 296 (V.I. 2008) for the proposition that the grazing of livestock, without more, is insufficient to establish a claim of ownership for purposes of adverse possession. However, the *Hodge* case dealt with an appeal of a decision rendered after a bench trial, in which the trial judge was permitted to make factual findings which, on appeal, could only be reversed if "completely devoid of minimum evidentiary support" or "b[ore] no rational relationship to the supportive evidentiary data." 50 V.I. at 316. Notably, the *Hodge* decision contains no indication that the land at issue was undeveloped agricultural land intended for the grazing of livestock, and — in any event — the trial judge in that case had rejected the adverse possession claim primarily because the claimant had "never identified the portion of

In this case, it is undisputed that the pertinent properties consisted of undeveloped agricultural land that had historically been used for cattle grazing. (J.A. 395, 439-40.) While courts are split as to the effect fencing may have on such an adverse possession claim — with some jurisdictions authorizing adverse possession claims based on livestock grazing only if the livestock graze on the disputed property despite the presence of a fence intended to keep wandering animals off the property, while other jurisdictions have no such requirement, *see Braunstein*, 226 P.3d at 834 (collecting cases) — here the affidavit of John Warlick, one of the title owners of the disputed property for part of the time Ridgway purportedly adversely possessed it, stated that he had "only observed cattle on the Property when such cattle broke through the fence adjoining the Property to the neighboring Castle Nugent Farms Ranch," (J.A. 119), indicating that the "fence-out" doctrine, even if applicable to the Virgin Islands,[5] would not preclude Ridgway from adversely possessing the property. Moreover, the affidavit of Raul Torrens, if credited, establishes that Ridgway had gated the disputed property for the purposes of keeping his cattle from leaving the disputed property, (J.A. 356), which would constitute evidence of actual and hostile possession. *See Mendoza v. Ramirez*, 336 S.W.3d 321, 328 (Tex. App. 2010) (explaining, in case where "fence-out" doctrine is applicable, that grazing may establish actual and hostile possession elements if claimant created, maintained, or repaired fence that was designed to enclose livestock on the property).

■■■■ With respect to the number of cattle which grazed on the disputed property, Ridgway, in his affidavit, stated that he allowed all of his cattle — more than 200 — to graze on the property, which was bolstered by the

---

[the parcel] on which the goats roamed nor that she intentionally led them to [the parcel] for grazing," and because "the mere sight of goats sporadically grazing on one's land would not lead a landowner to conclude that the owner of the goats was staking a claim on the property." *Id.* In other words, *Hodge* provides strong support for the proposition that grazing could establish the elements of adverse possession, even though the evidence introduced at the bench trial in that case was ultimately insufficient.

[5] As the *Braunstein* court explains, the "fence-out" doctrine has been adopted by various large western states in which the common law rule requiring owners of cattle to confine them had been abrogated, and cattle were therefore permitted to wander on any unenclosed land without their owners being liable for trespass. 226 P.3d at 834-35. Although it does not appear that this common law rule was ever abrogated in the Virgin Islands, it is not necessary for us to reach this issue since the Warlick affidavit, if credited by the finder of fact with Ridgway receiving the benefit of all reasonable inferences, establishes that Ridgway's cattle were present on the disputed property despite the presence of a fence intended to keep them out.

affidavit of Julio Encamacion, Sr., who stated that he saw Ridgway's cows graze all over the property and stated that Ridgway gave him permission to keep his horses on the property. (J.A. 310.) Likewise, the affidavit of Alfred Williams, if credited by the finder of fact, establishes that numerous activities took place on the disputed property with respect to Ridgway's cattle, including sorting cattle, looking for pregnant cattle, and medicating sick cattle. (J.A. 327.) In addition, numerous other individuals submitted affidavits attesting that cattle and horses were present at various points throughout the adverse possession period, with some individuals stating that they saw up to 50 cattle grazing on the property at any given time. (J.A. 338, 343, 346, 356, 364, 383, 421.) Finally, the record is replete with other evidence that — if believed — establishes other instances of Ridgway exercising control over the disputed property beyond grazing cattle, such as building roads on the property, (J.A. 281), constructing a pond, (J.A. 292), maintaining wells and fences, (J.A. 275-92), and posting "no trespassing" signs. (J.A. 286.) Therefore, the Superior Court erred when it held that Appellants failed to establish a genuine issue of material fact with respect to the actual, hostile, and physical possession elements.

### 2. Open and Notorious Possession

Similarly, Appellants argue in their brief that the record contained sufficient evidence that Ridgway openly and notoriously possessed the property. Specifically, Appellants contend that the presence of numerous cows on the property on a regular — if not daily — basis constituted sufficient evidence to establish this element. Golden Resorts, however, argues that the Warlick affidavit, as well as an affidavit submitted by Emerson Ussery, establish that any possession by Ridgway was not open and notorious, since Warlick stated that he never saw Ridgway on the property and Ussery swore that he never saw cows on the property when he inspected it between 1987 and 1991.

We agree with Golden Resorts that the Warlick and Ussery affidavits, if credited by the finder of fact, cast serious doubt on Ridgway's claim to have openly and notoriously possessed the disputed property. But at the summary judgment stage, both this Court and the Superior Court are obligated to view all of the evidence in the light most favorable to the non-moving parties — in this case, Appellants. As previously discussed in the context of the actual possession element,

multiple individuals submitted affidavits stating that they did, in fact, see Ridgway's cattle grazing on the disputed property and that they believed the property belonged to Ridgway. (J.A. 310, 327, 338, 343, 346, 356, 364, 383, 421.) Additionally, Ridgway introduced documentation that, when automobiles struck cows that had gotten loose from the disputed property, insurers were aware to seek subrogation from him. (J.A. 408.) Moreover, in addition to posting "no trespassing" signs, (J.A. 286), Ridgway submitted photographs, newspaper articles, and tourist maps describing or depicting hand-made signs depicting a drawing of a cow with the phrase "Slo Mon Crosin" that he had posted to mark the portion of the road where cattle would cross from the disputed property to the dairy across the street. (J.A. 476-90.) Although the Superior Court described these documents as "irrelevant" and "non-probative," (J.A. 45), the finder of fact could infer from these materials that Ridgway was not attempting to hide or conceal his presence or activities on the property. *See Harding v. Olympic Pipe Line Co.*, No. 23470-0-II, 1999 Wash. App. LEXIS 1089, at *7 (Wash. Ct. App. 1999) (unpublished) (relying, in part, on newspaper articles to establish open and notorious use). Thus, the Superior Court erred when it held that appellants had not shown the existence of genuine issues of material fact on the notorious possession element.

### 3. *Continuous and Exclusive Possession*

 Appellants also argue that sufficient evidence exists in the record to raise an issue of fact and to support a finding that Ridgway continuously and exclusively possessed the disputed property for at least fifteen years. Specifically, Appellants point to numerous affidavits submitted by individuals who claim to have seen Ridgway and his cattle on the disputed property from the late 1980s to the mid-2000s, and photographs of Ridgway and his livestock on the property at various points during this period, "[a]ccess by the cattle to the pasture on the disputed parcel is sufficient to show continuous use of the parcel even if the cattle didn't graze that particular grass each day." *Dinnel v. Weir*, No. A-07-885, 2008 Neb. App. LEXIS 181, at *9 (Neb. Ct. App. Sept. 23, 2008) (unpublished) (citing *Hardt v. Eskam*, 218 Neb. 81, 352 N.W.2d 583 (Neb. 1984)). *See also Witherill v. Brehm*, 74 Cal. App. 286, 240 P. 529, 532 (Cal. Ct. App. 1925) ("[T]o acquire title to water by adverse possession . . . . [i]t is not necessary that a claimant should use the water

all the hours of each day, or every day in the year for the prescribed statutory period, in order to establish uninterrupted or continuous use; it is only necessary that he shall have used it continuously during such portions of the day or year as is required for the beneficial use to which it is applied.").

We recognize that the record contains some evidence that Golden Resorts or the prior title owner may have, at various points, simultaneously occupied the land with Ridgway or otherwise regularly used the land. *See Fairdealing Apostolic Church, Inc. v. Casinger*, 353 S.W.3d 396, 396 (Mo. Ct. App. 2011) (holding the exclusivity element "is satisfied by showing that others do not jointly possess or use the land"). For instance, in their respective affidavits, Warlick states that he frequented the property at various times from 1987 through 1989, while Ussery states that he "regularly visited" the property from 1987 to 1991 to inspect and maintain it. (J.A. 119, 124-25.) However, we must again emphasize that, at the summary judgment stage, this Court must view all evidence in the light most favorable to Appellants, including providing Appellants with the benefit of all reasonable inferences arising therefrom. Although Ridgway did not dispute, in his affidavit, the claims made by Warlick and Ussery, we cannot ignore that the Warlick and Ussery affidavits make use of extremely broad and unspecific language — such as "regularly" and "frequent" — and, despite claiming to have controlled the disputed property for years, do not outline precisely what specific activities they performed during that period. In the absence of any testimony or other evidence specifically describing how Warlick or Ussery controlled the disputed property to such an extent as to render Ridgway's use non-exclusive, the finder of fact could find Warlick and Ussery not credible, and could infer that the control they exercised — if any — was minimal or only sporadic based on the skeletal descriptions in their affidavits. *Cf. In re Marriage of Weissgerber*, 2004 WI App 167, ¶ 36, 276 Wis. 2d 308, 686 N.W.2d 455 (Wis. Ct. App. 2004) (unpublished) (holding court could infer, from lack of detail in testimony and lack of corroboration, that party made not much, if any, effort to obtain a lawyer, despite party's testimony that she made numerous calls and could not obtain one).

Nevertheless, Golden Resorts also contends that Ridgway's continuous and exclusive possession of the property was interrupted because (1) the prior record owners had successfully lobbied to rezone the property in

1989, and (2) surveyors entered the land on Golden Resorts's behalf several times beginning in 2001. These activities, however, do not necessarily interrupt the fifteen year occupancy period.

█ As a threshold matter, we must address which party bears the burden of proof with respect to an alleged interruption of an adverse possession claimant's continuous and exclusive possession of a disputed parcel. Contrary to the claim in Golden Resorts's brief, the claimant does not bear the burden of disproving re-entry, but it is rather the record title owner who bears the burden of proving that a re-entry occurred that was sufficient to render the claimant's possession either non-continuous or non-exclusive. *Ortmann v. Dace Homes, Inc.*, 86 S.W.3d 86, 89 (Mo. Ct. App. 2002). In other words, although Appellants bear the burden of producing evidence of continuous and exclusive possession by Ridgway for at least fifteen years, Golden Resorts possesses the burden of proving that some intervening act by Golden Resorts or a prior record title holder interrupted the fifteen year period. *See, e.g., Jones v. Miles*, 189 N.C. App. 289, 658 S.E.2d 23, 29 (N.C. Ct. App. 2008) ("Once adverse possession has begun and the owner is on notice, the burden shifts to the record owner to take physical or legal action to interrupt the running of the . . . statutory period."); *cf. David v. Steller*, 269 A.2d 203, 204 (Del. 1970) ("While a party claiming title or rights by adverse possession or use has the burden of proving all the elements of an adverse holding, once that burden is met it is incumbent on the holder of record title to establish that the possession or use was permissive.").

█ █ On this record, Golden Resorts has failed, at the summary judgment stage, to introduce evidence sufficient to conclusively rebut the affidavits and other record evidence filed by Ridgway. First, Golden Resorts argues that Ridgway could not have maintained continuous and exclusive possession of the property because Ussery had successfully lobbied, on behalf of the former title owners, to rezone the property in 1989. Notably, Golden Resorts emphasizes that the attempt to rezone the property on behalf of the former title owners had been well-publicized and that Ridgway had been aware of the rezoning application, yet failed to attend a public hearing on the application or to otherwise lodge an objection. However, we agree with the courts that have held that a rezoning or similar government action does not interrupt the statutory adverse possession period unless it also interrupts the claimant's actual possession of the property. The Colorado Court of Appeals, in a case

involving virtual identical facts — a record title owner who successfully lobbied the county to exempt the disputed property from county subdivision regulations, with notice given to the adverse possession claimant, who failed to appear at the public hearing or otherwise object to the request — succinctly explained why such actions on behalf of the title owner are not sufficient to render the claimant's possession non-exclusive or non-continuous:

> Here, the proceedings on the application before the county commissioners, standing alone, did not dispossess plaintiff, nor did they constitute an entry on the land sufficient to reinstate the record owner in possession. The proceedings did not constitute legal action to regain possession of the land or the equivalent of such an action. . . . [T]he proceedings did not result in an ejectment of plaintiff or its predecessors in interest. Thus, acts of the record owner that did not include re-entry upon the land with intent to possess it and did not constitute legal action to retake possession of it were insufficient to interrupt the period of adverse possession of plaintiff who continued in actual, hostile possession of the property.
>
> Accordingly, we conclude that the record owner's successful application for exemption from county subdivision regulations did not interrupt plaintiff's period of adverse possession, and the trial court erred in concluding otherwise.
>
> . . . .
>
> Defendant also argues that the failure of plaintiff's predecessor to object to the application after receiving notice of the proceedings amounted to recognition of defendant's predecessor's title and right to exclusive control of the disputed property. Be that as it may, such recognition would not interrupt the adverse possession. . . . Here, plaintiff's actual possession of the property was not disrupted, and even if plaintiff's predecessor recognized that defendant's predecessor was asserting ownership of the disputed property, that fact, standing alone, does not demonstrate that plaintiff ceased to adversely possess the property.

*Ocmulgee Properties, Inc., v. Jeffery*, 53 P.3d 665, 667-68 (Colo. Ct. App. 2001) (citations omitted). *See also Elizabethan Dev., Inc. v. Magwood*, 479 So.2d 251, 252 (Fla. Ct. App. 1985); *Fish v. Bannister*, 759 S.W.2d 714, 717

(Tex. App. 1988) ("The mere execution of written instruments such as leases and easements by a record owner does not interrupt the exclusive nature of the possession unless there is an ouster, and the ouster must be of such a character that it would put a reasonably prudent person on notice that he had been ousted."). *Cf. Aguilar v. Davis*, No. B214931, 2010 Cal. App. Unpub. LEXIS 10361, at *16 (Cal. Ct. App. 2010) (unpublished) ("A judgment quieting title to property by adverse possession does not concern the use or development of the property. Any violation of a municipal zoning code is a separate issue not implicated in or adjudicated by that judgment."). Therefore, the mere rezoning of the property — without more — cannot render Ridgway's possession non-continuous or non-exclusive.

 Golden Resorts also introduced evidence that surveyors entered the land on its behalf several times beginning in 2001. But again, courts have consistently held that isolated or sporadic physical re-entries by the record owner or its agents are only effective to render the claimant's possession non-exclusive or non-continuous if they are done for the purpose of ousting the adverse possessor or otherwise asserting an exclusive claim to the property. *See, e.g., Sanford v. Dimes*, 3 Conn. App. 639, 491 A.2d 398, 400 (Conn. 1985) ("The mere act of turning around in the driveway is a sporadic act and could not defeat the exclusive possession claim."); *Martens v. White*, 195 S.W.3d 548, 556 (Mo. Ct. App. 2006) ("[S]poradic use, temporary presence, or permissive visits by others, including the record owner, will not defeat the exclusive element."). Importantly, multiple courts have held that "an entry for the purpose of a survey without a claim to the land is insufficient to oust an adverse possessor." *Miceli v. Foley*, 83 Md. App. 541, 575 A.2d 1249, 1257-58 (Md. Ct. App. 1990) (citing *Maysville & B.S.R. Co. v. Holton*, 100 Ky. 665, 39 S.W. 27, 29, 19 Ky. L. Rptr. 1 (Ky. 1897)). *Cf. Wilmoth v. Canfield*, 76 Pa. 150, 154 (Pa. 1874) ("The making of a survey . . . on another's land in his actual possession, afford[s] no ground for a constructive ouster.").

 In this case, the earliest attempt by Golden Resorts to oust Ridgway or to assert control over the property is described in the affidavit of Roy Rodgers, which states that — at some unspecified point between late 2004 and 2006 — he directed Ridgway to remove horses from the property after he observed them grazing on the property and was informed that Golden Resorts owned no horses and that the horses belonged to Ridgway. (J.A. 197.) To the extent this act, without more,

could constitute an ouster — given that Rodgers admits that Ridgway continued to make use of the property afterwards — it would have, at the earliest, occurred two years *after* the statutory period to obtain the land through adverse possession would have expired based on the evidence in the record, viewed in the light most favorable to Ridgway, indicating that he began to adversely possess the land in late December of 1986 or August of 1987. Therefore, the Superior Court erred when it held, at the summary judgment stage, that Ridgway had failed to establish continuous and exclusive use of the property.

### 4. Equitable Considerations

 The Superior Court, in addition to analyzing the elements set forth in title 28, section 11 of the Virgin Islands Code, also granted summary judgment in favor of Golden Resorts for other reasons. First, in its May 13, 2011 Opinion, the Superior Court observed that "[o]ne important factor distinguishes this claim of adverse possession by Ridgway from all others ever presented in this jurisdiction," stated that it "has not found any other recorded claim of title by adverse possession in this Territory that comes anywhere close to the two hundred ninety-eight (298) plus acres of land to which this claimant demands title," and then seemingly took judicial notice of the fact that "[t]ypically adverse possession cases in this jurisdiction involve relatively small parcels of land, usually used as a residence or homestead involving cultivation of crops." (J.A. 39-40.) However, nowhere in the plain text of section 11 of title 28, or in any other provision of the Virgin Islands Code, has the Legislature placed any limit to the size of a parcel that can be adversely possessed, or restricted adverse possession only to land used for residential or agricultural purposes. Similarly, a substantial portion of the May 13, 2011 Opinion performs a "balancing of the equities" analysis, in which the Superior Court ultimately concludes that Ridgway would be unjustly enriched if a court were to hold that he adversely possessed the property. (J.A. 53-58.) However, the elements of an adverse possession claim, as set forth in section 11 of title 28, already represent a policy judgment by the Legislature, which the Superior Court lacked authority to disregard by introducing additional elements or considerations not codified in the statute. *See Aguilar*, 2010 Cal. App. Unpub. LEXIS 10361, at *9 ("Aguilar's argument assumes that the court was required to 'balance the hardships' to the parties in adjudicating the adverse possession claim.

Balancing the hardships to the parties, however, is not an element of an adverse possession claim."). Therefore, to the extent any of these factors contributed to the Superior Court's ultimate decision to grant summary judgment in favor of Golden Resorts on Ridgway's adverse possession claim, the Superior Court committed error by imposing additional substantive requirements not mandated by statute.

We emphasize that, despite our conclusion that the Superior Court erred in granting partial summary judgment, we take no position as to whether Appellants should prevail at trial. As explained earlier, the legal standard for summary judgment requires that this Court view all record evidence in the light most favorable to Appellants, and provide Appellants with the benefit of all reasonable inferences. At trial, the finder of fact will be free to make credibility determinations and otherwise weigh the evidence with respect to the adverse possession claim. Accordingly, we reverse the grant of partial summary judgment, and — because the summary judgment award represented the sole reason for its issuance — reverse the permanent injunction.

## III. CONCLUSION

Since Appellants introduced sufficient evidence that, if credited, would allow a reasonable trier of fact to conclude that Ridgway adversely possessed the disputed property, the Superior Court erred in granting summary judgment on this claim and — based on the grant of summary judgment — issuing its permanent injunction. Therefore, we reverse the Superior Court's April 12, 2010, April 27, 2011, and May 13, 2011 Opinions, and vacate the August 4, 2011 Order.