IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**

January 18, 2024 10:34 AM
SCT-CIV-2019-0095
VERONICA HANDY, ESQUIRE
CLERK OF THE COURT

**For Publication**

## IN THE SUPREME COURT OF THE VIRGIN ISLANDS

| | |
|---|---|
| **PEDRO DECOSTA and IVA DECOSTA** <br> Appellants/Plaintiffs, <br><br> v. <br><br> **SAMUEL E. EBBESSEN** <br> Appellee/Defendant. | )   **S. Ct. Civ. No. 2019-0095** <br> )   Re: Super. Ct. Civ. No. 383/2008 (STX) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

On Appeal from the Superior Court of the Virgin Islands
Division of St. Croix
Superior Court Judge: Hon. Jomo Meade

Argued: March 9, 2021
Filed: January 18, 2024

Cite as: 2024 V.I. 7

**BEFORE:**    **RHYS S. HODGE,** Chief Justice; **MARIA M. CABRET,** Associate Justice; and **IVE ARLINGTON SWAN,** Associate Justice.

**APPEARANCES:**

> **Jeffrey B.C. Moorhead, Esq.**
> Jeffrey B.C. Moorhead. P.C.
> St. Croix, U.S.V.I.
>     *Attorney for Appellants,*

> **Kevin A. Rames, Esq.**
> Law Offices of K.A. Rames, P.C.
> St. Croix, U.S.V.I.
>     *Attorney for Appellee.*

## OPINION OF THE COURT

**CABRET, Associate Justice.**

¶1    Iva and Pedro DeCosta ("DeCostas") appeal the Superior Court's November 27, 2019 order granting summary judgment in favor of Appellee, Samuel E. Ebbessen ("Ebbessen"), in their action seeking title to 14 King Cross Street, Christiansted through adverse possession. As the DeCostas are unable to satisfy the hostility requirement of their adverse possession claim, this Court will affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶2    On November 5, 1962 Ebbessen took title and possession of 14 King Cross Street, Christiansted, U.S.V.I. ("Property"). (JA 48, JA 270). As a member of the military services, Ebbessen's duties required him to be away from St. Croix for extended periods of time. JA 270. In his absence, Ebbessen employed several attorneys and property management agencies to perform the day-to-day management responsibilities regarding the Property, one of them being the Eileen Morris Reality Agency. (JA 260-61). Ebbessen continued paying all required property taxes despite his absence, and never transferred ownership of the Property. (JA 48, JA 263-65).

¶3    On November 27, 1975 John and Iva DeCosta began occupying the Property with their five children: Pedro, Cheryl, Tyrone, John Jr., and Troy. (JA 35-36, 168-69, 205). Upon entering the Property, John DeCosta paid $70.00 a month in rent to a man known to the family as "Mr. Gibbs." (JA 36-37, 86-97). After an unspecified period, Mr. Gibbs informed John DeCosta that a woman named Eileen Morris ("Morris") would be collecting the rent for the Property from that point on. (JA 37-38, 208). Morris would either visit the Property to collect rent or John DeCosta would visit Morris at her office to provide payment. (JA 37-38). During this time, the DeCostas did not know Ebbessen owned the Property and they never signed a lease agreement. (JA 208).

¶4     John DeCosta made timely rental payments until he died in 1987. (JA 38). Following

John's death, Iva DeCosta continued paying rent until Hurricane Hugo hit St. Croix in 1989. (JA

38). Ebbessen was on military assignment in Alaska at the time of Hurricane Hugo and was

informed that the Property suffered severe hurricane damage. (JA 260-61). Ebbessen assumed

the Property was uninhabitable and abandoned after the hurricane. (JA 261).

¶5     But Iva DeCosta and her children continued to live on the Property, and shortly after

Hurricane Hugo, Iva DeCosta unsuccessfully searched for Morris to continue paying rent. (JA

38-39). In her attempt to locate Morris, Iva visited Morris's office where she learned for the first

time that Ebbessen was the owner of the Property. (JA 39-40). Iva DeCosta then went to the "tax

office" to inquire about contacting Ebbessen to pay him rent directly. (JA 39-40). There, a man

named Mr. Magras informed her that Ebbessen "went away" and possibly died. (JA 40). After

several failed attempts at paying rent, the DeCostas remained on the Property rent-free and made

no further attempts to contact Ebbessen until 2005. (JA 40, 206).

¶6     In 2005, Pedro DeCosta obtained a St. Thomas mailing address for Ebbessen from the

Recorder of Deeds in an attempt to contact him for a second time. JA 206. Pedro DeCosta wrote

and mailed a letter to the St. Thomas address; however, Ebbessen never received the letter nor

did he learn of Pedro DeCosta's attempted contact. (JA 206-07, 270-71).

¶7     After another failed attempt at contacting Ebbessen, the DeCostas, once again remained

on the Property rent-free. (JA 42). During their time on the Property, the DeCostas paid utility

bills and received mail in their name and did regular maintenance and repairs. (JA 198, 217). The

DeCostas also made improvements to the Property, such as planting a garden, building a wooden

structure around the cistern, and replacing the outer boards and windows of the house. (JA 198, 274). The DeCostas did not seek a government issued building permit or inspection when making or completing repairs. (JA 50). Additionally, the DeCostas did not lease the Property to third parties, nor did they ever use the Property as collateral for any loan. (JA 50).

¶8    In 2008, an organization known as the Women's Coalition of St. Croix organized a program that offered to paint buildings in disrepair in an effort beautify downtown Christiansted. (JA 52). To participate in the program, the Women's Coalition required individuals to provide documentation (e.g., a deed) proving they were the owners of the property subject to potential renovations. (JA 243). When a volunteer for the program, Dorrette Audain, approached the DeCostas with an offer to paint 14 King Cross Street, the DeCostas informed her that they could not authorize participation in the program because they did not own the Property and did not have the requisite documents demonstrating ownership. (JA 52, 243-44). Pedro DeCosta specifically informed Audain that "the home is not theirs" and that "they rent it." (JA 243-44).

¶9    After the Women's Coalition learned that the DeCostas could not authorize participation, an attorney with the program contacted Ebbessen seeking his permission to paint the Property. (JA 270-71). It was during this exchange in 2008 when Ebbessen first learned that the Property was occupied. (JA 270-71). Before this Ebbessen believed the Property was "uninhabitable because of its decrepit condition" following Hurricane Hugo. JA 270-271. Ebbessen also stated that he drove by the Property multiple times from 1998-2008 and confirmed its deplorable condition. (JA 271). Ebbessen, in his affidavit supporting his motion for summary judgment, indicated that he had "no knowledge of [the DeCostas'] occupancy and *had not granted anyone permission to live there.*" (JA 270-71) (emphasis added).

¶10    Ebbessen's counsel served the DeCostas with a forcible entry and detainer summons as well as an eviction summons shortly after discovering they were still on the Property. (JA 53). In response to the eviction notice, the DeCostas filed a verified complaint with the Superior Court on July 25, 2008 alleging title to the Property by adverse possession. (JA 53, JA 11). After a lengthy discovery process, Ebbessen filed a motion for summary judgment on December 12, 2012. (JA 138). In his motion, Ebbessen asserted that the DeCostas commenced possession of the Property as permissive tenants because they were paying rent on a monthly basis upon entering the premises. (JA 133). Ebbessen further argued that the DeCostas could not satisfy the hostility requirement of their adverse possession claim because they did not give Ebbessen *actual* notice of a superior claim to title following their permissive entry, nor did they effectively repudiate their existing tenancy to graduate from permissive tenants to adverse possessors. (JA 133-35).

¶11    On February 12, 2013, the DeCostas filed a counterstatement of material facts and on April 10, 2017 the DeCostas filed a supplemental brief in reply to Ebbessen's motion for summary judgment.[1] (JA 55, 268). The DeCostas argued that they were never permissive tenants as there was never a formal lease agreement executed between the parties and Ebbessen never granted anyone permission to live there. (JA 267). For this reason, the DeCostas maintained that

---

[1] The DeCostas claimed the following material facts were in dispute: (1) Iva and Pedro DeCosta were never tenants/lessees of Ebbessen nor were they ever given permission to reside on the Property; (2) Iva and Pedro DeCosta never paid monthly rent; only John DeCosta paid monthly rent; (3) The property was not uninhabitable after Hurricane Hugo; (4) The DeCostas did not attempt to pay anyone rent after Hurricane Hugo; (4) Pedro DeCosta wrote to Ebbessen in 2005 to advise him of his claim of ownership and to inquire about purchasing the adjacent property, not to inquire about purchasing No. 14 King Cross Street; (5) The DeCostas declined participation in the Paint and Scrape project because they could not provide the deed to the Property, not because they were not "owners." (JA 56-62).

they were never required to give actual notice of repudiation and their possession of the Property remained hostile for the required statutory period. (JA 267).

¶12    The Superior Court entered summary judgment in favor of Ebbessen on November 27, 2019. (JA 273-81). The Superior Court, relying on this Court's decision in *Peppertree Terrace v. Williams*, 52 V.I. 225 (V.I. 2009), reasoned that the DeCostas were permissive tenants under Title 28 V.I.C. § 831 and that their deposition testimony about monthly rent paid from 1975 to 1989 was proof of a periodic, month-to-month, tenancy. *Peppertree*, 52 V.I. at 232 (citing RESTATEMENT (SECOND) OF PROPERTY, LANDLORD AND TENANT § 1.5 cmt. d (1977)).[2] The Superior Court then concluded that as permissive tenants, the DeCostas were required to expressly notify Ebbessen of any hostile intent to change their status from permissive tenants to adverse possessors. (JA 273-81). As there was no evidence in the record to establish that the DeCostas gave Ebbessen actual notice of their hostile intent within the statutorily required time period, the Superior Court granted Ebbessen's motion for summary judgment. (JA 271-81). The DeCostas timely filed this appeal on December 13, 2019. (JA 1).

## II. JURISDICTION AND STANDARD OF REVIEW

¶13    This Court "[has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's November 27, 2019, memorandum opinion and order granting summary judgment to Ebbessen was a final order within the meaning of section 32(a),

---

[2] Although *Peppertree* is a pre-*Banks* decision relying on the Restatement, this Court adopted the same definition of a periodic tenancy in *Alvarez v. Estate of Keel*, 73 V.I. 538, 545 (V.I. 2020).

this Court has jurisdiction over this appeal. *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 379 (V.I. 2014) (citing *Perez v. Ritz–Carlton (V.I.), Inc.*, 59 V.I. 522, 527 (V.I. 2013)).

¶14   This Court exercises plenary review of Superior Court decisions granting summary judgment. *Kennedy Funding, Inc. v. GB Props., Ltd.*, 73 V.I. 425, 431 (V.I. 2020) (citing *Joseph v. Daily News Publishing Company, Inc.*, 57 V.I. 566, 581 (V.I. 2012)). "[W]hen reviewing a grant of summary judgment on appeal, this Court sits in the same position as the Superior Court and applies the same summary judgment test that governs the Superior Court's decision." *Id.* "Because summary judgment is a drastic remedy, it should be granted only when 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Kennedy Funding*, 73 V.I. at 431 (quoting V.I. R. CIV. P. 56(c); *Williams v. United Corp.*, 50 V.I. 191, 194 (V.I. 2008) (quoting former wording of FED. R. CIV. P. 56(C)). "Accordingly, when reviewing the record, this Court must view the inferences to be drawn from the underlying facts in the light most favorable to the non-moving party, and we must take the non-moving party's conflicting allegations as true if 'supported by proper proofs.'" *Kennedy Funding*, 73 V.I. at 431 (citing *Williams*, 50 V.I. at 194). The movant may satisfy his burden simply by "pointing out to the ... court that there is an absence of evidence to support the nonmoving party's case." *Aubain v. Kazi Foods of the V.I., Inc.*, 70 V.I. 943, 948 (V.I. 2019) (citing *Williams*, 50 V.I. at 194). Once the moving party meets his burden, the non-moving party then has the burden of "set[ting] out specific facts showing a genuine issue for trial." *Kennedy Funding*, 73 V.I. at 431 (citing *Williams*, 50 V.I. at 194).

¶15    In proving a genuine issue for trial, the non-moving party may not rest upon mere allegations but must present actual evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence presented may be direct or circumstantial, but "the mere possibility that something occurred in a particular way is not enough, as a matter of law, for a jury to find it probably happened that way." *Kennedy Funding*, 73 V.I. at 431 (citing *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001)). To survive summary judgment, the nonmoving party's evidence must "amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (citing *Saldana*, 260 F.3d at 232) (internal quotation marks omitted). The trial court must not undertake the task of weighing the evidence or determining the truth of the competing allegations; rather, it must "decide only whether there is a genuine issue for trial such that a reasonable jury could return a verdict for the non-moving party." *Id.* (citing *Anderson*, 477 U.S at 255).

## III. DISCUSSION

¶16    The Superior Court granted Ebbessen summary judgment because it found that the factual record did not provide clear and convincing proof of the DeCostas' hostile occupation of the Property. (JA 281-82). Pursuant to title 28, § 11 of the Virgin Islands Code, adverse possession is established by the "uninterrupted, exclusive, actual, physical adverse, continuous, notorious possession of real property under claim or color of title for 15 years or more." "The party asserting adverse possession bears the burden of proving all the required elements by clear and convincing evidence." *Mahabir v. Heirs of George*, 63 V.I. 651, 659 (V.I. 2015) (citing *Simpson v. Golden Resorts, LLLP*, 56 V.I. 597, 606 (V.I. 2012)).

## A. Permissive Tenancy

¶17    The DeCostas present several interrelated issues for appeal, nearly all which concern whether the Superior Court erred in finding them to be permissive tenants by virtue of paying rent from 1975 to 1989. The DeCostas argue that they were never permissive tenants because they never personally executed a formal written lease agreement with Ebbessen, nor did they assent to the terms of John DeCosta's agreement to pay rent. The DeCostas also rely heavily on Ebbessen's statement in his affidavit that he "had not granted anyone permission to live [on the Property]." *See* Ebbessen Aff. ¶ 9.

¶18    Title 28 V.I.C. § 831 defines the term "tenant" to include "a sub-tenant, lessee, sub-lessee, or other person entitled to the use or occupancy of any housing or business accommodations, other than the owner." The Virgin Islands recognizes several distinct categories of landlord-tenant relationships, one being a periodic tenancy. *See Alvarez v. Estate of Keel*, 73 V.I. 538, 545 (V.I. 2020). A periodic tenancy is "[a] lease (written or oral) of no stated duration, with rent to be paid monthly." *Id.* at 545 (citing *Williams*, 52 V.I. at 232). Periodic tenancies will continue indefinitely until properly terminated by one of the parties. *Id.* Under the Code, proper termination of a periodic tenancy requires 30 days written notice or 14 days in the event of nonpayment of rent. 28 V.I.C. § 752.

¶19    Here, the DeCostas commenced possession of the Property as permissive tenants. No one disputes that John DeCosta paid a woman named Eileen Morris and a man named Mr. Gibbs $70.00 in monthly rent from the time he entered the Property in 1975, until his death in 1987. This is evidenced by both the deposition testimony of Iva and Pedro as well as rental catalogues

listing each month the DeCostas paid rent from 1975 to 1989. The record also reflects that Ebbessen utilized Morris's real estate agency, The Eileen Morris Reality Agency, to manage the Property and collect rent in his absence. These two pieces of evidence, when taken together, demonstrate that Morris was collecting rent on Ebbessen's behalf. The undisputed monthly rental payments are in and of themselves sufficient to prove that a periodic tenancy existed when the DeCostas entered the Property in 1975. *See Williams*, 52 V.I. at 232 (holding that an undisputed fee with rent to be paid monthly "created a month-to-month tenancy that continued until it was properly terminated by one of the parties").

¶20    Despite the DeCostas' contentions, it is immaterial that there was never a formal written lease agreement executed between the parties because in the Virgin Islands a periodic tenancy may be created orally. *Williams*, 52 V.I. at 231 (holding that leases for an unspecified term or leases not to exceed one year may be created orally) (citing 28 V.I.C. §§ 241-242). In fact, periodic tenancies are typically informal arrangements. *Id.* It is also immaterial that Iva and Pedro were not parties to John DeCosta's oral agreement and that they did not expressly agree to the terms of John's arrangement to pay rent. The Virgin Islands Code defines the term "tenant" broadly to include "persons entitled to occupy the premises other than the owner." 28 V.I.C. § 831. Although Iva and Pedro did not meet Ebbessen nor expressly agree to the terms created by John DeCosta, as wife and son of John DeCosta, they were nevertheless entitled to occupy the premises when the DeCostas entered the Property. That said, the DeCostas repeatedly point to the statement in Ebbessen's affidavit that he had not granted anyone permission to live on the property. But the DeCostas have failed to provide any factual evidence to substantiate their assertion that this statement should be applied retroactively to the period before Hurricane Hugo.

The DeCostas cannot get around the fact that they entered the Property as permissive tenants, and that the sole reason they ceased paying rent is because they could not find Ebbessen to pay him. Ebbessen's affidavit states that up until 1985 he had other people manage the property, including collecting rent. (JA 270). The DeCostas themselves admitted that the family paid rent from 1975 to 1989. (JA 266). Consequently, this statement the DeCostas point to simply demonstrates that the DeCostas' periodic tenancy likely transformed into a tenancy at sufferance following Hurricane Hugo.[3] Nonetheless, there is no evidence in this record to dispute the fact that the DeCostas were paying rent upon entering the Property in 1975 and therefore had permission to reside on the Property until Hurricane Hugo.

### B. Hostile Intent

¶21    The next issue on appeal is whether the DeCostas, who entered the property as permissive tenants, can satisfy the hostility requirement of their adverse possession claim. The DeCostas' primary argument is that they were never permissive tenants. On the other hand,

---

[3] This Court has not expressly adopted a definition or rule regarding tenancies at sufferance; however, what constitutes a tenancy at sufferance is widely accepted and a majority of U.S jurisdictions have adopted a similar definition. *Hill v. Dobrowolski*, 484 A.2d 1123, 1125 (N.H. 1984) ("A tenancy at sufferance has been described generally as "'an interest in land which exists when a person who had a possessory interest in land by virtue of an effective conveyance, wrongfully continues in the possession of the land after the termination of such interest, but without asserting a claim to a superior title."' (citing 2 R. Powell, The Law of Real Property § 259, at 396.3 (Rohan rev. ed. 1983) (quoting Restatement of Property § 22 (1936)))); *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 915 (Tex. 2013) ("[A] tenant at sufferance is '[a] tenant who has been in lawful possession of property and wrongfully remains as a holdover after the tenant's interest has expired.'" (quoting BLACK'S LAW DICTIONARY 1605 (9th ed. 2009)); *Willis v. Harrell*, 45 S.E. 794, 795 (Ga. 1903) ("A tenant at sufferance holds over by wrong, and he is in possession, not by permission of the landlord, but as a result of his laches or neglect."); *Brady v. Scott*, 175 So. 724, 724 (Fla. 1937) ("[A] tenant at sufferance enters lawfully and holds over wrongfully without the land owner's assent or dissent."); *Hauxhurst v. Lobree*, 38 Cal. 563, 563 (Cal. 1869) ("At the expiration of the term for which the premises were leased, the defendant, by holding over, became a tenant at sufferance."); *Wolfer v. Hurst*, 80 P. 419, 421 (Ore. 1905) ("At common law a tenancy at sufferance was created when a person came into possession of land lawfully and held over wrongfully after his estate had ended."); *Sorensen v. Hendry*, 69 P.2d 1114, 1117 (Kan. 1937) ("A tenancy at sufferance arises only when a person comes into possession lawfully, but holds over wrongfully, after the termination of his interest.").

Ebbessen reiterates on appeal that the DeCostas never expressly notified him of their hostile intent and therefore never became adverse possessors following their permissive entry.

¶22 Hostility is one of six statutory requirements that must be satisfied to prevail on an adverse possession claim. 28 V.I.C. § 11. As many courts applying Virgin Islands law have previously stated, "there is no fixed rule or mechanical formula [to] determine if possession is hostile." *Mahabir*, 63 V.I. at 659; *see also McNamara v. Christian*, 26 V.I. 109, 112 (Terr. Ct. 1991); *Tutein v. Daniels*, 10 V.I. 255, 263 (D.V.I 1973). "It is the intention of the adverse claimant upon entering the property that fixes the character of his possession." *McNamara*, 26 V.I. at 112. When a claimant enters the property with the record title holder's permission, "such possession cannot acquire the character of adverse possession until the presumption of continued subservience is rebutted." *Alvarez*, 73 V.I. at 546 (quoting *Andrews v. Nathaniel*, 42 V.I. 34, 39 (V.I. Super. Ct. 2000)). This is so because "[p]ossession cannot be adverse if the possessor recognizes a superior ownership interest in the property, as possession, under those circumstances, is not hostile to the owner's interest." *Alvarez*, 73 V.I. at 546.

¶23 Generally, entry by virtue of a lease or the payment of rent bars adverse possession claims as either or both actions implicitly recognize a superior claim of another to the property and therefore, possession is not adverse or hostile. *See id.* at 545-46. "Although paying rent defeats a claim of adverse possession, the failure to pay rent, standing alone, does not compel a finding of adverse possession." *Id.* at 548. Thus, the true question of hostility following a permissive entry is whether the claimant gave the record title holder proper notice of their adverse or hostile intent. *See id.* at 546.

¶24    When the Superior Court issued its November 27, 2019, memorandum opinion and order, this Court had not yet established whether notice of hostile intent following a permissive entry must be communicated actually or constructively. Consequently, the Superior Court engaged in a *Banks* analysis and determined that a claimant must give *actual* notice of hostile intent to transform a permissive entry into an adverse one. Because the DeCostas could not provide evidence of such actual notice, the Superior Court granted Ebbessen's motion for summary judgment. However, in 2020, one year after the Superior Court made its determination, this Court held that constructive notice that property is under a claim of ownership can transform a permissive tenancy to a hostile claim. *Alvarez v. Estate of Keel*, 73 V.I. 538 (V.I. 2020).

¶25    In *Alvarez*, the claimant rented a plot of land under an 18-month lease and used the property as a barber shop. 73 V.I. at 543-44. The claimant had originally occupied the property with the owner's permission under a lease, and when the lease expired, the claimant continued paying rent on a monthly basis. *Id.* After some time, the owner passed away and the claimant remained on the property without paying rent to the owner's descendants. *Id.* The claimant continued running his barber shop, paid property taxes on the land for over 20 years, made significant improvements and repairs, and requested a government-issued loan to repair the property. *Id.* The claimant filed an action to quiet title and was eventually awarded ownership of the land through adverse possession. *Id.* This Court found that "[c]onstructive notice that possession is under a claim of ownership is sufficient to transform a permissive entry to a hostile claim." *Id.* at 551. In determining whether a claimant put the owner on sufficient constructive notice, the court will must look to actions taken on the land that are "unambiguous hallmarks of ownership." *Id.* at 550. In *Alvarez*, this Court held that the claimant's "actions were sufficient,

when taken together, to give the owner constructive notice that someone else was acting as owner of the land." *Id.* at 549.

¶26    Unlike the claimant in *Alvarez*, however, the DeCostas failed to place Ebbessen on sufficient constructive notice of their adverse or hostile intent. Although *Alvarez* and the instant case are similar in the sense that the claimants in both cases entered the respective properties as permissive tenants, the cases are distinguishable in significant ways. First, the claimant in *Alvarez* paid property taxes on the land for over 20 years while the DeCostas, in contrast, did not pay any property taxes for over 20 years. Payment of property taxes can be significant evidence in determining whether a landowner was placed on sufficient constructive notice. *Alvarez*, 73 V.I. at 550 (finding that payment of property taxes is an unambiguous hallmark of ownership). Their failure to do so weakens the DeCostas' adverse possession claim, especially considering that Ebbessen paid all required property taxes while the DeCostas remained in possession of the Property. Ebbessen's payments illustrate his continued interest in maintaining ownership of the Property. *See Edmonds v. Thurman*, 808 S.W.2d 408, 410-11 (Mo. App. Ct. 1991) (finding the landowner and their predecessors in title paid property taxes from 1962 onward and this weighed against adverse possessor's claim).

¶27    In addition to paying property taxes, the claimant in *Alvarez* took numerous other actions on the land which "demonstrated to the landowners that Alvarez's interest was possessory and therefore adverse." *Alvarez*, 73 V.I. at 550. In *Alvarez*, this Court specifically noted that,

> Certainly a tenant cannot obtain a leased property by adverse possession simply by paying property taxes, but in addition to possessing the property exclusively for more than 50 years, [the claimant] also unilaterally took other actions that a landowner would normally undertake, including making numerous improvements

and repairing the property after hurricane damage, without any prior agreement that he would do so, including undertaking an SBA loan to accomplish such improvements and repairs.

*Id.* Here, the DeCostas did not present similar proof of "unambiguous hallmarks of ownership" of the Property. The DeCostas did not rent the Property out to third parties, they did not take out liens or mortgages against the Property, nor did they use the Property as collateral for a loan, and they never held themselves out as owners of the Property to third parties. And while the DeCostas point out that they paid all utility bills and received mail at the Property, these are actions commonly taken by both tenants and owners alike. The DeCostas made some improvements and repairs to the property; such as replacing some of the outer boards of the house and replacing the flooring in the kitchen. (JA 198). However, these improvements and repairs were neither extensive nor significant, in the sense that they did not materially change the character of the Property. Indeed, the record shows that Ebbessen had passed by the Property multiple times between 1998 and 2008, and that during these observations, the Property remained largely unchanged in a dilapidated and unsafe condition. This is distinguishable from the actions of the claimant in *Alvarez*, whose repairs were so significant he was able to maintain a business on the premises. The evidence the DeCostas point to is not enough to establish constructive notice of the DeCostas' adverse or hostile intent.

¶28 The final, and most important, distinction from the circumstances reviewed in *Alvarez* is that the DeCostas have consistently recognized Ebbessen's superior claim of ownership to the Property. In *Alvarez*, the claimant ran a business on the premises and held himself out as the landowner to customers and third parties. In contrast, the DeCostas consistently asserted that

they were merely renting the property and did not hold themselves out as owners. This is evidenced by Iva DeCosta's repeated attempts to pay rent following Hurricane Hugo as well as Pedro DeCosta's statement – that they "rent" the Property – to Audain when asked to participate in the Women's Coalition Program. The DeCostas' attempts to pay rent and their acknowledgment to a third party that they did not own the property are actions which recognized Ebbessen's superior claim to title, even though they never actually paid rent after Hurricane Hugo. Additionally, while the claimant in *Alvarez* filed a quiet title action to establish that he was the owner of the land, here the DeCostas filed an action for adverse possession only *after* Ebbessen served them with an eviction notice. This illustrates that the DeCostas only asserted a claim to ownership when it became clear that Ebbessen would not allow them to remain on the Property.

¶29 The circumstances surrounding the Property show that Ebbessen was not alerted to the DeCostas' intention to assert ownership at any point. The ongoing state of disrepair of the Property, and the DeCostas' failure to hold themselves out as owners, both indicate a lack of the required hostility in the DeCostas' actions. As a result, their adverse possession claim cannot be sustained, as they fail to meet the crucial requirement of "hostility" for establishing adverse possession.

## IV. CONCLUSION

¶30 The DeCostas have not demonstrated genuine issues of fact that warrant the reversal of the summary judgment entered by the Superior Court. The DeCostas began their use of the property as permissive tenants, and their adverse possession claim lacks evidence to support the

required element of hostility. As a result, we affirm the Superior Court's grant of summary

judgment.

**Dated this 18th day of January 2024.**

**BY THE COURT:**

**MARIA M. CABRET**
**Associate Justice**

**ATTEST:**

**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**

By: _____
**Deputy Clerk**

Dated: January 18, 2024